712 So.2d 74 (1998)
Senator J. Lomax "Max" JORDAN
v.
LOUISIANA GAMING CONTROL BOARD and Murphy J. "Mike" Foster, Jr.
Senator Ronald C. BEAN
v.
LOUISIANA GAMING CONTROL BOARD and Rivergate Development Corporation.
Nos. 98-C-1122, 98-C-1133 and 98-C-1134.
Supreme Court of Louisiana.
May 15, 1998.
*76 Charles William Roberts, Baton Rouge, Camille F. Gravel, Jr., Alexandria, for Applicants in No. 98-C-1122.
William Hardy Patrick, III, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Daniel R. Murray, Jenner & Block, for Applicants in No. 98-C-1133.
E. Kay Kirkpatrick, Roy Achille Mongrue, Jr., Baton Rouge, Richard Phillip Ieyoub, Attorney General, Anne Lacour Neeb, Baton Rouge, for Applicants in No. 98-C-1134.
Joseph Lomax Jordan, Jr., E. Kay Kirkpatrick, Roy Achille Mongrue, Jr., Baton Rouge, Richard Phillip Ieyoub, Attorney General, Anne Lacour Neeb, Cheney C. Joseph, Jr., Baton Rouge, William Hardy Patrick, III, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Daniel R. Murray, Jenner & Block, Roy J. Rodney, Jr., New Orleans, William Edward Steffes, Paul Slocomb West, Robin Ward Bueche, Baton Rouge, Rudy Joseph Cerone, New Orleans, for Respondents in No. 98-C-1122.
Charles William Roberts, Baton Rouge, Camille F. Gravel, Jr., Alexandria, Joseph Lomax Jordan, Jr., E. Kay Kirkpatrick, Roy Achille Mongrue, Jr., Baton Rouge, Richard Phillip Ieyoub, Attorney General, Anne Lacour Neeb, Cheney C. Joseph, Jr., Baton Rouge, Roy J. Rodney, Jr., New Orleans, William Edward Steffes, Paul Slocomb West, Robin Ward Bueche, Baton Rouge, Rudy Joseph Cerone, New Orleans, for Respondents in No. 98-C-1133.
William Hardy Patrick, III, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Daniel R. Murray, Jenner & Block, Charles William Roberts, Baton Rouge, Camille F. Gravel, Jr., Alexandria, Joseph Lomax Jordan, Jr., Cheney C. Joseph, Jr., Baton Rouge, Roy J. Rodney, Jr., New Orleans, William Edward *77 Steffes, Paul Slocomb West, Robin Ward Bueche, Baton Rouge, Rudy Joseph Cerone, New Orleans, for Respondents in No. 98-C-1134.
Joseph E. Friend, New Orleans, Stephen F. Chiccarelli, Baton Rouge, for Amicus Curiae Unsecured Creditors Committee.
Sam A. LeBlanc, III, New Orleans, Edgerton L. Henry, Baton Rouge, James G. Perdigao, New Orleans, Brace B. Godfrey, Jr., Baton Rouge, Robert Markle, for Amici Curiae Chamber New Orleans-River Region and Business Council of New Orleans-River Region.
Floyd J. Falcon, Jr., Baton Rouge, for Amicus Curiae A.F.L.-C.I.O.
Peter J. Butler, Peter J. Butler, Jr., New Orleans, for Amicus Curiae Centex Landis Construction.
William Lurye, Nancy Picard, Metairie, Michael R. Allweiss, Mark Samuel Goldstein, Alicia Martone Bendana, New Orleans, for Amici Curiae Susan N. Poirier, Darlene A. Moss and Cassandra Adams in No. 98-C-1134.
Louis L. Robein, Jr., Nancy Picard, Metairie, for Amici Curiae International Union Operating Engineers, Peter Babin III Financial Secretary, Southeast Louisiana Building and Construction, AFL-CIO, and Joseph Bertucci in No. 98-C-1134.
JOHNSON, Justice.[*]
The parties involved in this dispute seek a determination as to which entity has the authority to bind the state to the amended casino operating contract pending before a bankruptcy judge. The plaintiffs argue that the latest contract essentially is a "new" contract and, accordingly, that under La. R.S. 27:224(E), the legislature is empowered with the authority to approve the contract on behalf of the state. The defendants argue that the latest contract pending before the bankruptcy judge is not a new contract, but is rather a renegotiation of the original contract and that, therefore, the Louisiana Gaming Control Board has the independent authority to renegotiate and execute the renegotiated contract under La. R.S. 27:245. Defendants further argue that, contrary to plaintiffs' contention, La. R.S. 27:245(A) has not been impliedly repealed. For the reasons that follow, we hold that the Board does have the independent authority to renegotiate and execute the casino operating contract without gubernatorial or legislative approval.

FACTS AND PROCEDURAL HISTORY
On July 15, 1994, the State of Louisiana, through the Louisiana Economic Development and Gaming Corporation (hereinafter "LEDGC"),[2] executed a casino operating contract with Harrah's Jazz Company (hereinafter "HJC") for a period of twenty years with a ten-year extension option. HJC is a Louisiana general partnership formed in 1993 for the purpose of owning and operating a landbased casino in New Orleans, Louisiana, on the site of the former Rivergate Convention Center. HJC was formed by three partners: Harrah's New Orleans Investment Company (a Nevada corporation), New Orleans Louisiana Development Corporation (a Louisiana corporation), and the Grand Palais Casino, Inc. (a Delaware corporation). Thereafter, HJC paid to LEDGC $125 million dollars and, pursuant to the agreement, began operating a temporary casino at the Municipal Auditorium in New Orleans while the permanent casino was under construction.
On November 21, 1995, HJC closed the temporary casino and suspended construction of the permanent casino. On November 22, 1995, HJC filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. HJC is currently the debtor-in-possession in the case entitled, "In Re: Harrah's Jazz Company, Debtor," United States Bankruptcy Court for the Eastern District of Louisiana, No. 95-14545 TMB.
On May 1, 1996, pursuant to La. R.S. 27:11,[3]27:15[4] and 27:31,[5] the legislature *78 formed the Louisiana Gaming Control Board (hereinafter "Board") to replace and succeed the LEDGC, as it proved unworkable to have a regulatory agency, the former LEDGC, funded by the entity that it regulates. The Board statutorily assumed all of the authority that had been granted to its predecessor, including the authority to renegotiate the provisions of any casino operating contract of a casino operator that is in bankruptcy.
On January 29, 1998, the bankruptcy court confirmed HJC's Third Amended Joint Plan of Reorganization. This plan called for the formation of Jazz Casino Company, L.L.C. (hereinafter "JCC"), a limited liability company, to succeed HJC. Under the plan, JCC would be wholly owned by JCC Holding Company, a publicly traded company. The Official Bondholders Committee, a committee appointed by the bankruptcy trustee, would own approximately 52% of JCC Holding Company, and the remaining stock would be owned by the three partners who had formed HJC. The plan further provided that on the effective date of the renegotiated contract, all of HJC's rights, title, and interest in any and all property, including all present and future claims, causes of action, real and personal property, movables and immovables, shall transfer and vest in the JCC, free and clear of all liens, claims, and encumbrances and that JCC shall be deemed to be the successor to HJC.
Thereafter, the Board renegotiated the casino operating contract that was to be transferred to the successor JCC. After the Attorney General rendered an opinion on March 16, 1998, stating that the Board had the authority to do so, the Board approved the renegotiated contract by resolution in a 7-1 vote on March 20, 1998. The Board has not yet, however, executed the renegotiated contract.
Prior to the Board's approval of the renegotiated contract, Senator Ronald C. Bean filed a petition in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, naming the Board as the defendant on March 18, 1998. Also on March 18, 1998, Senator J. Lomax Jordan filed a similar petition in the same court. Both petitions sought a judgment declaring that the Board does not have independent authority to renegotiate, approve, or execute a new casino operating contract and that the Board is statutorily obliged to obtain approval of the Louisiana Legislature before entering into a casino operating contract.[6] The two matters *79 were consolidated, and we ordered the district court to render judgment on the merits no later than April 3, 1998.[7]
On April 3, 1998, the trial court rendered judgment in favor of the Board.[8] In her oral reasons for judgment, Judge Clark found that the legislature, in adopting La. R.S. 27:210(B), granted the Board independent authority to renegotiate and execute the Amended and Renegotiated Casino Operating Contract. The trial judge reasoned that La. R.S. 27:31 transferred the power and authority of the LEDGC to the Board, that La. R.S. 27:245(A) granted the Board the power and authority to renegotiate the contract of a casino operator that had been placed in bankruptcy, and that La. R.S. 27:245(A) had not been repealed by La. R.S. 27:224(D). She also relied on Devillier v. State, Department of Public Safety and Corrections, 634 So.2d 884 (La.App. 1st Cir. 1993), writ denied, 635 So.2d 1101 (La.1994), in which this court held:
[S]ome powers and authority may be implied as necessary and appropriate in order to effectuate the express powers granted to, or imposed upon, such board or agency.
The trial court determined that the power and faculty in the Board to modify and amend the casino operating contract is necessary to perform the functions for which it was created.
The trial court also found no conflict between La. R.S. 27:245(A) and La. R.S. 27:224(D) and (E). The trial judge reasoned that La. R.S. 27:245(A) addresses action by the Board on its own initiative when a casino operator enters bankruptcy, while La. R.S. 27:224(D) addresses action by the Board by order of the governor or the legislature. The trial judge also found that there existed no circumstances under which the legislature had the right to approve a casino operating contract prior to its execution and perfection. She found that the execution of casino contracts is an executive function that had been properly delegated to the executive branch through the Board by the legislature. Insofar as La. R.S. 27:224(D) and (E) subject the acts of the governor or Board to legislative approval or authorize the legislature to take executive action in entering a casino operating contract on its own authority, the trial judge found them to violate the separation of powers doctrine of Louisiana Constitution Article II, section 2. Moreover, the trial court found that the governor has no authority to execute a casino operating contract because the Board had been granted that authority under La. R.S. 27:210.
The trial court concluded that the Amended and Renegotiated Casino Operating Contract approved by the Board was a renegotiatedand not a newcontract. The trial court determined that to the extent that JCC is a party to the contract as an assignee, the contract is an accessory contract, essentially of suretyship, because the intent of the parties is that JCC act as surety for the performance of the casino operating contract. Moreover, the trial court held that the Louisiana Legislature has no authority to approve the renegotiated contract prior, or subsequent, to its execution. Following the ruling by the trial court, plaintiffs sought immediate relief from this court. On April 9, 1998, we issued an order denying the request to bypass the court of appeal and ordered the court of appeal to conduct an expedited hearing on the matter.
On April 22, 1998, the court of appeal rendered its decision in which it affirmed the trial court's judgment in part and reversed it in part.[9] The majority affirmed the trial court's determinations that the Board can renegotiate the casino operating contract without the approval of the legislature or governor and that La. R.S. 27:245 had not been repealed by La. R.S. 27:224(D) or (E). However, the majority reversed the portion of the trial court's judgment that found that the legislature had no authority to approve a *80 renegotiated contract prior, or subsequent, to its execution. In so doing, the majority held that, under La. R.S. 27:224(D), the legislature may set aside or order the Board to renegotiate the provisions of the casino operating contract of a casino operator in bankruptcy, provided that the legislature acted before the Board executed the renegotiated contract. The court of appeal reserved the issue of the constitutionality of La. R.S. 27:224(D) for decision by this court.
Plaintiff, Senator Bean, filed writ application to this court, alleging that the court of appeal erred to the extent that it determined that the Board possesses independent authority to approve and execute a "new" casino operating contract without obtaining the approval of the Louisiana Legislature. (98-C-1122). The Board and Governor Foster also filed a writ application, alleging that the court of appeal erred in reversing that portion of the trial court's judgment that had held that the Louisiana Legislature had no authority to approve the casino operating contract prior to its execution and further alleging that the court of appeal erred in failing to address the trial court's holding that the Board is authorized by law to execute the casino operating contract without legislative approval. (98-C-1134).
HJC and the Official Bondholders Committee intervened and filed a writ application, seeking a declaratory judgment by this court affirming the trial court's judgment to the extent that it declared that the Board has the authority to execute the Amended and Renegotiated Casino Operating Contract. (98-C-1133). HJC and the Bondholders also sought to have this court vacate the other rulings by the court of appeal, alleging that the question of the scope of the legislature's powers under La. R.S. 27:224(D) and (E) does not present a justiciable controversy. On May 1, 1998, Senator Jordan filed a response to the writ applications, alleging that Act 384 of 1992 and Acts 7 and 58 of the First Extraordinary Session of 1996 reversed the public policy of the State of Louisiana and transferred the promotion, development, and regulation of the casino to a state agency under a new legal scheme, thereby removing certain powers from the Board and returning those powers to the legislature. Further, Senator Jordan alleged that the court of appeal failed to recognize that the end result of a renegotiation of a contract [even in bankruptcy] may, in fact and law, be a "new" contract, which would require legislative approval under La. R.S. 27:224(E).

DISCUSSION

A. Whether La. R.S. 27:245(A) has been repealed.
La. R.S. 27:245(A) reads as follows:
The board shall have the right to set aside or renegotiate the provisions of any casino operating contract of a casino operator who is voluntarily or involuntarily placed in bankruptcy, receivership, conservatorship, or similar status. The corporation may agree in writing to allow the casino operator to be placed in bankruptcy, receivership, conservatorship, or other similar status without setting aside, revoking, or renegotiating the casino operation contract.
(emphasis added). Clearly, under the plain and unambiguous language of the statute, the Board is granted the authority to renegotiate the casino operating contract where, as in the instant case, the casino operator has been voluntarily placed in bankruptcy. Further, there is no statutory requirementeither expressed or impliedin La. R.S. 27:245(A) that the Board seek either gubernatorial or legislative approval of the renegotiated contract. Senators Bean and Jordan, however, urge that La. R.S. 27:245(A) is no longer in force, arguing that 245(A) was rather implicitly repealed by the legislature's 1996 amendments to La. R.S. 27:224, which added subsections (D) and (E).
Louisiana Civil Code article 8 provides in pertinent part:
Laws are repealed, either entirely or partially, by other laws.
A repeal may be express or implied. It is express when it is literally declared by a subsequent law. It is implied when the new law contains provisions that are contrary to, or irreconcilable with, those of the former law. *81 Nonetheless, it is well settled in the jurisprudence that repeals by implication are not favored. Thomas v. Highlands Ins. Co., 617 So.2d 877, 878 (La.1993); State v. Piazza, 596 So.2d 817, 819 (La.1992); In re Robin Sapia, 397 So.2d 469, 473 (La.1981); Gulf Oil Corp. v. State Mineral Bd., 317 So.2d 576, 587 (La.1974); State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601, 626 (1937). As such, a repeal by implication will be found only where there is an irreconcilable conflict between two statutes and where there exists no possible construction that could give both statutes effect. In re Robin Sapia, 397 So.2d at 473; Standard Oil, 178 So. at 626. We find, as did the lower courts, no such irreconcilable conflict between La. R.S. 27:245(A) and La. R.S. 27:224(D) and (E).

La. R.S. 27:224(D) provides as follows:
The governor by executive order, subject to legislative approval either by vote or by mail ballot, or the legislature by Act or Resolution may set aside or order that the corporation renegotiate the provisions of the casino operating contract of a casino operator who is voluntarily or involuntarily placed in bankruptcy, receivership, conservatorship, or similar status. Any action so taken shall constitute the revocation or modification of a pure and absolute revocable privilege as provided in R.S. 27:202(C). Neither the State of Louisiana nor any political subdivision thereof shall be liable in damages for such revocation, modification, or order for renegotiation.
Subsection (D), which tracks the language used in 245(A), purports to give the legislature the power to set aside or to order the Board to renegotiate the casino operating contract when, inter alia, the casino operator is voluntarily placed into bankruptcy. We see no conflict between La. R.S. 27:245(A), which grants authority to the Board to set aside or renegotiate the casino operating contract on its own initiative when the operator is placed in bankruptcy, and La. R.S. 27:224(D), which grants the governor, subject to legislative approval, or the legislature, acting alone, the authority to set aside the casino operating contract or to order the Board to renegotiate it when the operator is placed in bankruptcy. La. R.S. 27:245(A) and La. R.S. 27:224(D) simply provide alternate means for the initiation of renegotiations or for the setting aside of the existing operating contract.
This interpretation is supported by the legislative history. Representative Stephen Windhorst, a co-sponsor of House Bill 9, which became Act 58 of 1996 that added subsections (D) and (E) to La. R.S. 27:224, and the Chairman of the House Committee on the Administration of Criminal Justice, a committee that reported on this bill, testified at a Senate Judiciary Committee meeting and his House Committee meeting with respect to the purpose of the amendment that added subsection (D). The purpose of subsection (D), according to Representative Windhorst, was to address the legislature's concern that because LEDGC (the Louisiana Gaming Control Board had not yet been created) was funded by the casino operator that was then in bankruptcy, thereby depriving the LEDGC of funding, there was no entity that was empowered to take any action against the casino operator in response to its bankruptcy. Prior to the passage of this bill, only the LEDGC could set aside the contract or renegotiate it where the casino operator was in bankruptcy. "What this bill does ... is allow the Governor and/or the legislature to take that action." Transcript of Hearing, Committee on Judiciary B, April 15, 1996, p. 64; see also Minutes, Administration of Criminal Justice Meeting, March 28, 1996, p. 2. Thus, there is absolutely no indication that the amendment of La. R.S. 27:224 was intended to give the legislature the power to prevent the LEDGC from setting aside or renegotiation the contract of a bankrupt casino operator, nor is there any evidence that it was intended to require final approval by the legislature for any amended, renegotiated contract to become effective. Rather, the legislative history supports only the finding that the legislature intended that some entity would be empowered to act in the event that the casino operator was placed in bankruptcy or similar status.
La. R.S. 27:224(E) reads as follows:
The governor by executive order or the board overseeing the operation of the casino, subject to legislative approval either by *82 vote or by mail ballot, or the legislature by Act or Resolution may negotiate a new casino operating contract.
Unlike La. R.S. 27:245(A) and 27:224(D), La. R.S. 27:224(E)'s application is not limited to circumstances in which the casino operator has been placed in bankruptcy or similar status, but is broader in its reach. La. R.S. 27:224(E) grants the governor, subject to legislative approval, or the legislature, acting alone, the right to negotiate a new casino contract. Again, we see no irreconcilable conflict between this provision and La. R.S. 27:245(A). La. R.S. 27:224(E) can be construed to apply only to negotiations of a "new" contract for a casino operator and not to the clearly distinguishable "renegotiation" of the existing casino operating contract, pursuant to La. R.S. 27:245(A) or even La. R.S. 27:224(D), which applies only in the limited circumstance where the casino operator has been placed in bankruptcy or similar status.
We also note two other items of legislative history that lend support to the proposition that La. R.S. 27:245(A) was not implicitly repealed. In the Act that created the Louisiana Gaming Control Board and transferred to it all of the powers, duties, and obligations of the LEDGC, Section 3 provided that all of the statutory provisions found in the Louisiana Riverboat Economic Development and Gaming Control Act, the Video Draw Poker Devices Control Law, and the Louisiana Economic Development and Gaming Corporation Act were to be redesignated and consolidated with the new Gaming Control Board provisions by the Louisiana State Law Institute. Thus, pursuant thereto, the Institute redesignated former La. R.S. 4:645 as La. R.S. 27:245(A). Furthermore, we note that Section 2 of Act 58 of 1996, which added subsections (D) and (E) to La. R.S. 27:224, stated that the additions were not intended to make any change in the law, but were only intended to "clarify the intent of the legislature when it enacted" the original casino laws in 1992.
Thus, considering the legislative history described above and the fact that La. R.S. 27:245(A), 27:224(D), and 27:224(E) can all be construed harmoniously, we find, as did the lower courts, that the legislature did not implicitly repeal La. R.S. 27:245(A) by amending La. R.S. 27:224 in 1996 to add subsections (D) and (E). We next conclude that the Board has the independent authority to renegotiate the casino operating contract pursuant to that statute, without seeking gubernatorial or legislative approval. Finally, we hold that the Board is authorized to execute the renegotiated contract, pursuant to La. R.S. 27:15, which provides, in pertinent part, that the Board shall have "all the power incidental and necessary to such regulatory authority, control, and jurisdiction over all aspects of gaming activities and operations as authorized pursuant to the provisions of the... Louisiana Economic and Gaming Corporation Act...."

B. Whether the Casino Operating Contract is a new or renegotiated contract.
Having concluded that the Board has the independent authority to renegotiate the contract under La. R.S. 27:245(A), we must now decide whether the proposed renegotiated casino operating contract constitutes a "new" contract or a modified version of the original operating contract executed in July 1994. By its terms, La R.S. 27:245(A) grants the Board the independent authority to renegotiate the contract of a casino operator who has been placed in bankruptcy or similar status. However, if the contract is deemed to be a "new" contract, then the Board cannot rely upon La. R.S. 27:245(A), as "new" contracts are governed by La. R.S. 27:224(E), which reads as follows:
The governor by executive order or the board overseeing the operation of a casino subject to legislative approval either by vote or by mail ballot, or the legislature by Act or Resolution may negotiate a new casino operating contract.
Thus, pursuant to La. R.S. 27:224(E), only the governor, subject to legislative approval, or the legislature, acting alone, has the authority to negotiate a "new" casino operating contract.
The trial judge found that the proposed renegotiated contract was not a "new" contract, explaining her view, as set forth in her oral reasons, that "[t]he Amended and Renegotiated *83 Casino Operating Contract is not a new contract but a security deviceit is an accessory contract essentially of suretyship securing the obligations of HJC under the initial Casino Operating Contract." Eight of the twelve court of appeal judges also concluded that the renegotiated contract was not a "new" contract. We agree.
Plaintiffs argue that the renegotiated contract is, in actuality, a new contract because it has new terms and signatories. However, by its very nature, a "renegotiation" connotes the potential for variance from the contract that resulted from the original negotiations. Indeed, we find that La. R.S. 27:245(A) contemplates the possibility that a renegotiation with a casino operator might lead to an amended, renegotiated contract with the successor to the debtor in possession, as one of the possibleif not probableoutcomes of a casino operator voluntarily placing itself in bankruptcy is that a new and different entity will be named the successor to the bankrupt entity and will be vested all of its rights, title and interest in any and all property. A transfer of all or part of the property of a bankrupt estate to one or more entities, whether organized before or after the confirmation of the bankruptcy reorganization plan, is allowed under 11 U.S.C. § 1123(a)(5)(B).
That this possibility was known to the LEDGC at the time that the original contract was executed and, more likely, to the legislature when it enacted La. R.S. 27:224(E) in 1996, is apparent by the very terms of the original 1994 casino operating contract. In that contract, LEDGC noted that it could be "compelled by the Bankruptcy Court to acquiesce in an assignment duly approved by the Bankruptcy Court," but indicated that it had no "duty to consent ... to any proposed assumption and assignment" of the contract. This contractual provision, existing at the time of the enactment of La. R.S. 27:224(E), as well as the legal reality that one possible outcome of a bankruptcy is that a different entity may become the successor to the rights and obligations of a debtor in possession, support the inference that when the legislature gave the Board the authority to renegotiate the casino operating contract of an operator in bankruptcy, pursuant to La. R.S. 27:245(A), this necessarily included or contemplated the possibility that a renegotiated contract would contain new and different terms as well as obligate a new and different entity as a casino operator.
Plaintiffs further argue that even if the proposed contract was "renegotiated" pursuant to the Board's authority in La. R.S. 27:245(A), it is nevertheless subject to the requirement of legislative approval found in La. R.S. 27:224(E), which applies to all "new" contracts. In other words, plaintiffs argue that any and all "new" contracts, regardless of whether they are newly negotiated or the result of a renegotiation, must get final approval of the legislature. Plaintiffs' argument, however, is not supported by the statutory language of La. R.S. 27:224(D) and (E) and La. R.S. 27:245(A). Those three provisions all provide that certain entities (the governor, the Board, and the legislature), with or without legislative approval depending on the provision, may "renegotiate" the contract of a bankrupt operator or may "negotiate" a "new" contract. A comparison of the sentence structure of 245(A) and 224(D) with the very similar structure of that in 224(E) shows that 224(E) merely provides the method for the initiation of negotiations of a "new" contract, whereas sections 245(A) and 224(D) provide the method for the initiation of renegotiations of an existing contract where the operator is in bankruptcy. Had the language in 224(E) provided that "any contract to be executed is subject to legislative approval," we might give more credence to the argument that 224(E) was intended to control the execution of all contracts, regardless of the circumstances of their inception. As it stands, however, the only reasonable interpretation to be given 224(E) is that it applies to purely new contracts, while 224(D) and 235(A) apply to renegotiated contracts of a bankrupt casino operator.
In addition, and most importantly, traditional principles of contract interpretation support the conclusion that the inclusion or substitution of a different casino operator as a result of HJC's bankruptcy does not render the contract a "new" one within the meaning of La. R.S. 27:224(E). The original *84 1994 contract, which is still in effect to this day, provides at Article XXIX, Section 29.12 that the casino operating contract "may be amended or modified only by an agreement in writing signed by both the LEDGC and the Casino Operator." Furthermore, Article XXVII of the 1994 contract provides in Section 27.1 that "[t]he Casino Operator shall not Transfer this Casino Operating Contract, or any interest herein ... without first obtaining the Approval of the LEDGC." Also, Section 27.4 provides "[t]he Casino Operator shall not Transfer this Casino Operating Contract, or any interest herein ... without first obtaining the Approval of the LEDGC." Also, Section 27.4 provides "[t]he LEDGC may Approve the sale, transfer, or assignment of the Casino Operating Contract, or any interest therein, or may grant such Approval subject to the conditions imposed by the LEDGC or by the applicable law." Thus, it is clear that the original contract authorizes, subject to approval by the LEDGC (now the Board), the amendment of terms of the contract by the Board and HJC, as well as its assignment or transfer by HJC to a new entity. In fact, this is what will be done in this case. Article I, Section 1.1 of the proposed casino operating contract provides:
Pursuant to the Casino Act, the Gaming Board and HJC hereby amend and renegotiate the Initial Casino Operating Contract on the terms set forth in this Amended and Renegotiated Casino Operating Contract....,
Recital No. 6 on page 1 of the proposed contract provides:
WHEREAS, the gaming Board has agreed to renegotiate this Casino Operating Contract with HJC and has Approved the amendment, renegotiation and assignment of this Casino Operating Contract as amended and renegotiated to JCC as HJC's successor pursuant to the Plan as of the Plan Effective Date....
Finally, Article XXVIII, Section 28.16 stipulates:
This Amended and Renegotiated Casino Operating Contract is hereby assigned to JCC, as successor to HJC, as set forth in the Plan. Pursuant to R.S. 27:236(B) and LAC 42:IX 2901 et seq., the Gaming Board Approves such assignment by HJC to JCC. JCC hereby undertakes the obligations of the Casino Operator under this Amended and Renegotiated Casino Operating Contract.
The foregoing demonstrates that the Board and HJC have indicated their approval of both the amendment of the terms and the assignment and transfer of the contract thereafter by HJC to JCC. That these changes were contemplated and, indeed, authorized by the original contract lend even further support to the proposition that the contract resulting from the recent negotiations is merely an amended version of the original contract that arises from that contact and is not a "new" contract within the meaning of La. R.S. 27:224(E).
In sum, although it may be different from the original contract, the resulting contract is not a "new" one. For "renegotiation" to have any meaning, it necessarily must connote change in some way from the original contract. That sections 224(D) and 245(A) allow for the renegotiation of a contract of an operator in bankruptcy necessarily contemplates the legal reality of this type of bankruptcy proceedingthat is, that a new entity will become vested with all rights, title and interest of the bankrupt entity. Here, although there are different terms in the proposed, amended contract, the contract itself contemplated that it could be amended with the consent of LEDGC and the casino operator, HJC, which has been given in this case. Additionally, the contract itself, entered into by the LEDGC pursuant to the authority given it by the legislature, authorized the assignment or transfer of the contract by HJC to another party with the approval of LEDGC. The Board, which now exercises all of the authority, powers, and duties of the LEDGC, has indicated its approval of this assignment.
In conclusion, we find that the circumstances presented do not in any way fall under the scope of La. R.S. 27:224(E), which broadly deals with "new" contracts, but rather come within the purview of La. R.S. 27:224(D) and 27:245(A). Under the latter, the Board has the unqualified power and *85 authority to renegotiate the casino operating contract of a casino operator who is placed in bankruptcy. Under the former, the legislature is given the power to order the Board to renegotiate the contract, but this grant of power cannot be reasonably read to operate as a limitation on the Board's authority to do so without legislative approval, nor can it be interpreted to require final approval by the legislature of the renegotiated contract.

C. Whether a decision regarding the legislature's authority to set aside the casino operating contract under La. R.S. 27:224(D) would result in an advisory opinion.
The final issue we must decide is whether the court of appeal erred in its reversal of the trial court's holding to the extent it denied "the legislature a right to participate in the process." One plaintiff in his petition for declaratory judgment had specifically asked "[w]hether or not, and under what circumstances the legislature may set aside the provisions of the casino operating contract." The trial court, in oral reasons, stated the legislature could not do so and that such a law would be "constitutionally infirm." The court of appeal reversed this conclusion, finding that the legislature was given the power to set aside the casino operating contract of an operator in bankruptcy and that this power could be exercised prior to the execution of the renegotiated contract. It would have been more proper, however, for the court of appeal to have vacated the trial court judgment to the extent it addressed the powers of the legislature, or the governor, to set aside the existing casino operating contract. Although the plaintiff requested a judgment declaring whether or not the legislature may set aside the provisions of the operating contract, the trial court should have refused to address this issue, instead finding that it did not present a justiciable controversy and, as such, that any opinion rendered thereon would be advisory.
Actions for declaratory judgment, like actions for conventional judgments, must present a justiciable controversy. American Waste & Pollution Control Co. v. St. Martin Parish Police Jury, 627 So.2d 158, 161 (La. 1993). It is well settled that courts will not decide abstract, hypothetical, or moot controversies and will not render advisory opinions with respect to such controversies. Louisiana Associated General Contractors, Inc. v. State, 95-2105 p. 9 (La.3/8/96); 669 So.2d 1185, 1193. To avoid deciding abstract, hypothetical, or moot questions, courts require cases submitted for adjudication be justiciable, ripe for decision, and not brought prematurely. St. Charles Parish School Board v. GAF Corporation, 512 So.2d 1165 (La.1987). In Abbott v. Parker, 259 La. 279, 249 So.2d 908 (1971), this court addressed the "justiciable controversy" issue in the specific terms of a declaratory judgment action:
A "justiciable controversy" connotes, in the present sense, an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of a conclusive character. Further, the plaintiff should have a legally protectable interest at stake, and the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
See also Tugwell v. Members of the Board of Highways, 228 La. 662, 83 So.2d 893, 899 (1955)(on rehearing)("[A] declaratory judgment action generally cannot be maintained unless it involves some specific adversary question or controversy asserted by interested parties and based on an existing state of facts, and a declaration of rights must be refused if the issue presented to the court is academic, theoretical, or based upon a contingency which may or may not arise.").
In the instant case, there is no indication whatsoever that the legislature has sought to set aside the operating contract or that legislation to do so has been or will be introduced. As such, there is presently no justiciable controversy between the parties as to whether or not the legislature, in fact, is, or is not, empowered to do so under La. R.S. 27:224(D). As such, the trial court's holding in oral reasons that the legislature lacks this power was an impermissible advisory opinion *86 and should have been vacated by the court of appeal.

DECREE
For the foregoing reasons, we affirm the portion of the court of appeal judgment that concludes that the Louisiana Gaming Control Board has the independent authority to renegotiate and execute the casino operating contract without seeking gubernatorial or legislative approval. However, we vacate that portion of the court of appeal's judgment that purports to interpret the legislature's power to set aside the contract under La. R.S. 27:224(D). Finally, we order that any application for rehearing must be filed not later than seventy-two hours after the rendition of this opinion.
AFFIRMED IN PART; REVERSED IN PART.
KNOLL, J., dissents and assigns reasons.
KNOLL, Justice, dissenting.
Finding that the operating contract approved by the Board on January 28, 1998, is a new contract, I dissent from the majority opinion. Because of this finding, all other issues are pretermitted in this discussion.
The majority totally ignores the laws of obligations and cloaks its position in terms of a renegotiation of a contract placed in bankruptcy to create a legal fiction as though this bankruptcy status immunizes the original contract from the Louisiana law of obligations. A simple application of our contract law demonstrates that the contract at issue is a new contract.
La.Civ.Code art. 1756 defines a legal obligation:
An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something.
In the proposed contract, HJC, the original obligor, is released and forever discharged from any and all matter of claims, and all of its debt under the original contract with the State is extinguished. A new obligor, JCC, will be legally bound to perform under new terms and conditions. The new obligee is the Board, which was created by Act 7 of 1996 and who replaces the old obligee, the self-funded LEDGC which was created under Act 384 of 1992. The terms of performance required of JCC are not simply the assumption of the obligations of HJC; those claims for performance will be released and forever discharged by the State, not the trustee in bankruptcy. Simply, the State has negotiated with a new party for better conditions and more onerous terms of performance in its favor. However, whether this new contract with a new party, new terms, and new assurances of completion is acceptable to the State of Louisiana is an issue which requires legislative approval.
The proponents of the "renegotiated" operating contract assert that the casino operator remains unchanged, since JCC is merely the successor in interest to HJC under the contract. This is incorrect. JCC is only the successor in interest to HJC's rights under the original agreement. JCC has in no way assumed any responsibility for HJC's obligations under the original agreement. As far as JCC is concerned, the obligations of HJC under the original contract are extinguished. No assumption of the prior obligations will occur, and JCC is not HJC's full successor in interest under the original contract. Instead, the original obligations have been extinguished, and new obligations have been created under the new operating agreement. As JCC is not a full successor, JCC is a different obligor under the "renegotiated" operating contract.
Such a change in obligors constitutes a subjective novation which is a new contract. La.Civ.Code art. 1882 provides:
Novation takes place when a new obligor is substituted for a prior obligor who is discharged by the obligee. In that case, the novation is accomplished even without the consent of the prior obligor, unless he had an interest in performing the obligation himself.
In the instant case, a subjective novation has clearly occurred. A new obligor, JCC, has been explicitly substituted for HJC, the *87 original obligor. In addition, under the terms of the new operating agreement, HJC has been released from its obligations under the original contract. In the "State Release Agreement," attached to the new contract, the State agrees to:
release and forever discharge [HJC, JCC, and any or all their Affiliates, successors and assigns ] ... of and from any and all matter of Claims ... by reason of any matter, cause, or thing whatsoever to the extent such Claims arose prior to the effective date, including, but not limited to any Defaults (as defined in the Original Casino Operating Contract) under the Original Casino Operating Contract.
Under the release agreement, HJC's obligation is extinguished. Simultaneously, JCC has agreed to perform the obligations previously owed by HJC, namely the construction and operation of a casino at the Rivergate site under the new operating agreement. The State is agreeing to release HJC only because JCC has promised to fulfill the new agreement.
The proponents of the renegotiated contract, namely Harrah's Jazz Company, LLC., has asserted that novation cannot occur because "there has been no release or discharge by [the Board] of HJC from the contract."[1] This assertion is manifestly incorrect. As noted above, the State has explicitly and comprehensively expressed its intent by releasing HJC from its obligation. The State has also consented to the new obligor's performance. JCC has expressed its intent by simultaneously agreeing to undertake the new contract.[2] The parties have clearly and explicitly consented to the novation. In short, the proposed contract awards the right to operate the casino to a new party. It is a new contract.
HJC claims that the contract at issue is not a new contract because the fundamental terms are the same. While the fundamental terms are the same, this does not support HJC's argument because the fundamental terms are dictated by law. There can be no change to the underlying cause of the contract, namely the development of a land based casino at the site of the Rivergate Convention Center in Orleans Parish. That provision is already required by La.R.S. 27:203 and La.R.S. 27:241(A). The twenty year term with a ten year option is likewise specifically statutorily required, as is the minimum annual payment of $100,000,000, and the minimum size of 100,000 square feet. See La.R.S. 27:241. The requirements for suitability and the minimum standards required of the operator are dictated by La. R.S. 27:234 and 235. It is therefore not surprising that these fundamental provisions remain unchanged in the new contract; they could not be changed. Any new land casino contract awarded by the board will necessarily contain all of these provisions.
In order to satisfy all parties interested in the bankruptcy, significant changes had to be made to the agreement itself. A comparison of the two contracts reveals that of the negotiable provisions, several have been significantly changed. As noted above, the casino operator is changed from HJC to JCC. The original guarantors of the Completion Guaranty will be released and new guarantors, namely, Harrah's Entertainment, Inc., and Harrah's Operating Company will be *88 substituted. Additional sureties, namely Reliance Insurance Company and United States Fidelity and Guaranty Company will be added. Furthermore, under the new contract, the State of Louisiana agrees to release and forever discharge its claims under the original operating agreement. Additionally, there are major changes concerning the lease of the second floor level of the casino, a compromise concerning dockside riverboat gambling, and minors' access to the second floor level. I find that these are significant changes to the substance of the negotiable provisions of the contract. These changes directly affect the interest of the citizens of this state. In effect, the State is recognizing that its relationship with HJC has failed, and it is beginning a new relationship with JCC.
Because the operating agreement with JCC is a new contract rather than a renegotiated one, it is subject to legislative approval under La.R.S. 27:224(E), which provides:
The governor by executive order or the board overseeing the operation of the casino subject to legislative approval either by vote or by mail ballot, or the legislature by Act or Resolution may negotiate a new casino operating contract.
The inherent weakness in the majority opinion is its failure to address this contractual issue under Louisiana contract law. If the issue would have been analyzed under our laws of obligations, the inescapable conclusion is that the original contract was novated, thus, the contract at issue is a new contract. Instead, the majority turns to statutory interpretation dealing with the authority of the Board and the Legislature. It finds that the Board can renegotiate the contract. That was never the issue. The real issue is whether the revisions of the original contract render it a new contract or "merely an amended version of the original contract." This issue should be determined by applying Louisiana laws of obligations. The majority opinion clearly skips this step and makes a quantum leap to find the Board is merely renegotiating the original contract because HJC is in bankruptcy court. For the reasons assigned above, I find the operating contract approved by the Board is a new contract, hence legislative approval of the proposed new operating agreement is required. I therefore respectfully dissent.
NOTES
[*] Victory, J., not on panel. Rule IV, Part 2, § 3.
[2] The LEDGC was created in La. R.S. 27:210 and granted all powers necessary to perform the functions for which it was created, including the power of granting an exclusive contract to operate a casino gambling establishment.
[3] La. R.S. 27:11 provides in part:

"The Louisiana Gaming Control Board is hereby created...."
[4] La. R.S. 27:15 provides in part:

"A. The board shall regulate all gaming activities and operations in the state as more specifically provided in this Title and other applicable laws.
B. The board shall:
(1) Have all regulatory authority, control, and jurisdiction, including investigation, licensing, and enforcement, and all power incidental or necessary to such regulatory authority, control, and jurisdiction over all aspects of gaming activities and operations as authorized pursuant to the provisions of the Louisiana Riverboat Economic Development and Gaming Control Act, the Louisiana Economic Development and Gaming Corporation Act ... except as otherwise specified in this Title...."
[5] La. R.S. 27:31 provides in part:

"A. (1) Beginning May 1, 1996, the board established in this Title shall undertake and become the sole and exclusive regulatory and supervisory board for gaming operations and activities authorized by the Louisiana Riverboat Economic Development and Gaming Control Act, the Louisiana Economic Development and Gaming Corporation Act, and the Video Draw Poker Devices Control Law....
(2) Effective May 1, 1996, the Riverboat Gaming Commission is abolished.
(3) Effective May 1, 1996, the Louisiana Gaming Control Board shall assume control of the affairs of the Louisiana Economic Development and Gaming Corporation.
(B) Effective May 1, 1996, all powers, duties, functions, and responsibilities of the regulatory entities designated in Paragraph (2) and (3) of Subsection A of this Section are transferred to and shall be performed and exercised by the Louisiana Gaming Control Board. In addition, all of the obligations of those entities are transferred to the Louisiana Gaming Control Board. Upon the transfer of the powers, duties, functions, and responsibilities accomplished by this Section, any pending or unfinished business of those regulatory entities shall become the business of and be completed by the Louisiana Gaming Control Board with the same power and authority as the entity from which the functions are transferred...."
[6] Both petitions originally sought injunctive relief, but the plaintiffs withdrew this demand prior to trial.
[7] This action was prompted by the filing of supervisory writs to this court, wherein the applicants sought to bypass the district court and proceed directly to this court. We denied the request on March 27, 1998.
[8] See Case No. 448,192, consolidated with No. 448,218.
[9] Slip Opinion, 1998 WL 204587, 712 So.2d 959 (La.App. 1 Cir.).
[1] Counsel for HJC cites a provision of the State Release Agreement which provides:

Notwithstanding the foregoing, nothing contained in this Agreement shall release or waive any rights or obligations of the parties pursuant to the Casino Operating Contract or any other document executed or delivered pursuant to the plan.
This citation is blatantly misleading. The Recitals of the State Release Agreement specifically state that "Casino Operating Contract" only refers to the proposed contract between the State and JCC. The original plan, executed by LEDGC and HJC is specifically distinguished as the "Original Casino Operating Plan." Plainly, by its very terms, the citation has no effect on the comprehensive release of all obligations arising under the original contract. In fact, the cited language applies only to a release of an obligation which arises under a contract that has not even been created.
[2] Note that subjective novation pursuant to Art. 1882 does not require the consent of the original obligor when that obligor has no interest in performing the obligation himself. Such a situation arises when the original obligor's credit standing, professional reputation, or social prestige would be affected by his failure to personally perform the obligation. See Litvinoff, Obligations § 17.31.