859 So.2d 167 (2003)
NORFOLK SOUTHERN CORPORATION, Norfolk Southern Railway Company, Norfolk and Western Railway Company, the Alabama Great Southern Railroad Company, Southern Region Industrial Realty, Inc., Central of Georgia Railroad Company, and the Cincinnati, New Orleans and Texas Pacific Railway Company
v.
CALIFORNIA UNION INSURANCE COMPANY and Certain Underwriting Members of Lloyd's, et al.
Nos. 2002 CA 0369, 2002 CA 0371, 2002 CA 0372.
Court of Appeal of Louisiana, First Circuit.
September 12, 2003.
Writ Denied December 19, 2003.
*171 Cory R. Cahn, Benjamin R. Slater, Jr., Benjamin R. Slater, III, New Orleans, Carmack M. Blackmon, Baton Rouge, Counsel for Plaintiffs-Appellees Norfolk Southern Corporation, et al.
*172 H. Alston Johnson III, Michael D. Hunt, Freddie Pitcher, Jr., Jane H. Barney, Baton Rouge, Richard N. Dicharry, New Orleans, Counsel for Defendants-Appellants Certain Underwriting Members of Lloyd's.
Before: FOIL, KUHN, and CLAIBORNE,[1] JJ.
CLAIBORNE, J.
The Norfolk Southern Corporation and certain of its affiliated railroad companies (collectively Norfolk)[2] filed this lawsuit for declaratory judgment and damages against various underwriting members of Lloyd's of London and certain London Market Insurance Companies (collectively the London Insurers).[3] In its original and amended petitions, Norfolk sought a declaration that it had coverage under several excess comprehensive general liability policies subscribed to by the London Insurers from 1969 to 1986 for the costs of cleaning up various polluted sites around the United States, including three sites located in St. Tammany parish, Louisiana: (1) the Pearl River site; (2) the Bayou Bonfouca site; and (3) the Southern Shipbuilding site.[4] Three judgments dealing with (1) coverage, (2) allocation method among various policies, and (3) designation of policy in accord with judgment (2), are challenged in separate appeals numbered 2002 CA 0369, 2002 CA 0371, and 2002 CA 0372, respectively.[5]

I. BACKGROUND

A. Pearl River Site
The Pearl River site consists of several acres of land in St. Tammany parish that had been owned by Norfolk since 1882.[6] In 1963, Norfolk leased the site, consisting of approximately 16.5 acres, to the Pearl River Wood Preserving Company (PRWPC) for use in its wood-treating operations. *173 In connection with this lease, the parties also entered into an agreement providing for the construction and operation of railroad tracks into the site to allow Norfolk to provide rail service to PRWPC.
In its wood-preserving operations, PRWPC initially used pentachlorophenol (penta) as a preservative but later switched to creosote. When the wood-treating facility was constructed in 1963, PRWPC dug two unlined, earthen pits near the facility in order to contain wastewater from its operations. Creosote, penta, and water were deposited into the pits and on the ground during the normal course of operations. The creosote, which was heavier than water, ultimately sank to the bottom of the pits, where some of it was occasionally recovered and used again in the wood-treating operations.
At times, these pits would overflow, and the wastewater, including creosote and penta components, would flow across the site toward a low-lying wooded area at the edge of the property. From there, the wastewater would continue beyond the property boundaries, underneath Interstate 59 to a nearby bayou, and then on to the Pearl River. Aerial photos of the site taken in the 1960s demonstrate extensive environmental damage in this low-lying area, such as stains and large unvegetated areas covered with dead trees, which resulted from contact with creosote and other wood preservatives.
In 1971, the predecessor entity of the Louisiana Department of Environmental Quality (LDEQ) directed the PRWPC to construct a levee in the low-lying area of the property in order to prevent this wastewater from running off site. Once the levee was constructed, the wastewater began to collect against the levee forming what was later referred to as the large surface impoundment. The wastewaters that collected here were periodically pumped to another lagoon at the northern end of the site, where they were disposed of through evaporation.
PRWPC closed the Pearl River facility and moved its creosoting operations into Mississippi in late 1973 or 1974. The unlined pits were subsequently filled in with soil, and in 1977, Norfolk leased part of the property to E.M. McIntire, who operated the Pear River Chemical Company on the site. Norfolk also leased part of the property to Pearl River Transport Company for use as a cement factory.
In 1980, Norfolk sold the property to Pearl River Transport, which assumed McIntire's lease. Pearl River Transport subsequently sold one-half of the property to Pearl River Chemical Company (now Chemlink). Throughout all periods, Norfolk retained a right of way along the railroad tracks in order to continue to provide rail service to the businesses at the site. Norfolk built new tracks into the site in 1982, and continued to provide rail service there at the time of trial.
In 1983, Norfolk notified the EPA of suspected hazardous materials releases on the site. In 1985, the LDEQ collected and analyzed samples of material from the Pearl River site and ultimately determined that these samples contained hazardous waste substances that could present an imminent and substantial endangerment to health or the environment. On September 22, 1987, the LDEQ issued an order naming PRWPC, Norfolk, Atlantic Richfield Company (ARCO), and others as potentially responsible parties (PRPs) in connection with the results of this analysis and required that they submit a remedial work plan for the site.[7]
*174 Testing revealed that the groundwater at the site had been contaminated with wood preservative components, and that this contamination had migrated beyond the property boundaries. The LDEQ believed that the large surface impoundment was a significant source of this groundwater contamination, as well as a threat to trespassers and children who might enter the site, and ordered Norfolk and the other PRPs to remediate that area. In 1994, Norfolk began excavating the contaminated soils from the impoundment and shipped them to a hazardous waste landfill. This cleanup operation took approximately eight months to complete. The excavated area was then filled in with clean soil.[8]
The LDEQ also ordered an investigation of the two earthen pits on the site. The investigation revealed a highly contaminated area around the old process unit near the pits, as well as groundwater contamination that was moving off the site. Therefore, in 1995, the LDEQ ordered the removal of that source of contamination. The remediation of this area of the site began in June 1998, and was completed approximately one month later. The site has been remediated at a total cost to Norfolk of $5,335,688.49.[9]

B. Bayou Bonfouca Site
The Bayou Bonfouca site is comprised of approximately 55 acres of land and 4,000 feet of navigable water located in Slidell. The site was operated as a wood-preserving facility from 1882 to 1972. Creosote was used throughout this period in the normal operations of the facility, which included treating wooden railroad ties, pilings, and telephone poles.
In 1976, the United States Coast Guard discovered creosote in the sediments of the Bayou Bonfouca waterway. Subsequent investigation of the site by the United States Environmental Protection Agency (EPA) and other entities confirmed the existence of high levels of creosote contamination on the surface of the site, as well as in the bayou sediments and groundwater on the site. Based on these findings, the site was placed on the National Priorities List in 1983, thus identifying it as one of the facilities at which releases or threatened releases of hazardous substances are found to present threats to public health, welfare, or the environment. After additional investigation of the site, the EPA began remediation procedures, including the construction of a groundwater treatment facility on the site in 1990.
In 1996, the EPA filed a cost recovery action regarding the site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) against The Alabama Great Southern Railroad Company (AGS) and others. AGS was named as a defendant in the proceedings as the successor to the New Orleans & Northeastern Railroad (NO & NE). According to the EPA, NO & NE, which was merged into AGS on January 31, 1969, had built and operated the creosote facility on the site in the 1880s. The EPA set forth three theories of liability against AGS: (1) the railroad had owned the site from 1882 to 1902; (2) the railroad had operated the site from *175 1882 to 1884; and (3) the railroad had control of the site as an owner/operator until 1972 by virtue of various track agreements with the creosote companies that conducted operations at the site.[10]
According to the EPA's suit, the site became contaminated during its years of operations due to numerous substantial releases of creosote caused by operations and disposal practices that remained essentially unchanged throughout the period of the operation of the facility. In addition, the EPA alleged that an unknown amount of creosote was released onto the ground and into the bayou when a holding tank on the site ruptured during a fire at the site.[11]
The site was fully cleaned up under the direction of the EPA. As part of the removal action, the EPA decided to dredge the sediments in the bayou and bring them on site. The EPA also excavated the highly contaminated soils on the site and began to pump and treat the groundwater. An incinerator was brought onto the site, and all of the contaminated soils and sediments were incinerated. A landfill was constructed on the site, and the treated soil was placed there. By 1996, most of the work on the site was completed, but remediation of the groundwater contamination had not yet been completed.
At the time of the jury trial in this action between Norfolk and the London Insurers, the underlying CERCLA suit regarding the site had not been resolved; however, the government had spent approximately $140,000,000 to remediate the site.[12] Norfolk has since settled the underlying suit with the government for $13,000,000.[13]

C. Southern Shipbuilding Site
This site has been operated by various companies as a shipbuilding, repair, painting, and cleaning operation since approximately 1917. The property damage at the site consisted mostly of soil contamination, and there was no evidence of groundwater contamination.
The various companies that operated at the site cleaned barges and the holds of ships with solvents and other degreasing materials. The first general area of concern involved the washout generated from these cleaning operations. Beginning in the late 1930s or 1940s, the washout was pumped into two pits, where it contaminated the soil. The other general area of contamination involved the painting operations conducted on site, which resulted in heavy metals and paint materials contamination of soil.
The EPA sent Norfolk notification in 1994 that it might be a PRP and requested *176 information from Norfolk about its connection to the site. The notification did not direct Norfolk to take any action with regard to the site other than provide the requested information. In the notice, the EPA specifically alleged that Norfolk held at least one contract for the servicing of a vessel with one of the companies operating on the site. According to the EPA, the servicing of the vessel or vessels may have resulted in the disposal of hazardous substances at the site. Although Norfolk did provide rail service to the site beginning in approximately 1938, no allegations of liability were made against Norfolk concerning the existence of these tracks.
Norfolk responded to this notice by advising the EPA that it had confused Norfolk with another company, and that whatever services had been provided to Norfolk at the site had not resulted in the production or disposal of hazardous waste. At the time of the jury trial in this matter, Norfolk had not received any additional communication from the EPA and had not been ordered to take any action in connection with the site. Furthermore, neither the EPA nor any other entity has filed suit against Norfolk or ordered Norfolk to take any action regarding the site.
The EPA began its investigation into the contamination at this site in 1987. The EPA decided to remediate the site by excavating the contaminated materials and moving them off site. The contaminated materials were then sent to the incinerator at the Bayou Bonfouca site, and the excavated areas were filled in with clean soil.

D. The Insurance Policies
Pursuant to the various policies in effect from 1969 to 1986, the London Insurers agreed as follows:
To indemnify the Assured for any and all sums which the Assured shall be legally liable to pay and shall pay as damages and expenses as more fully defined by the term "ultimate net loss" on account of personal injury and property damage as herein defined arising out of occurrences happening during the policy period as stated in the schedule forming part of this policy and due to the conduct of the Assured's business.[14]
The term "occurrence" was most commonly defined in the policies as "one happening or series of happenings, arising out of or due to one event."[15] The policies further defined "property damage" to exclude damage to property owned by the assured or property in the care, custody, or control of the assured.[16]
All of the policies provided excess insurance coverage in successive layers above a substantial self-insured retention (SIR) in accordance with the terms of the policies. Southern Railway Company (now known as Norfolk Southern Railway Company) obtained the first of these policies on April 11, 1969, and obtained subsequent policies for distinct periods at various excess layers until October 25, 1982. Most of the policies were for one-year periods, but certain policies did extend for a three-year period *177 from 1972-1975.[17] Prior to 1969, Southern Railway was self-insured, except for certain hazardous cargo insurance not at issue here.
In 1982, Southern Railway Company and Norfolk and Western Railway Company merged to form Norfolk Southern Corporation, which then obtained three-year excess policies lasting from July 11, 1982 to July 11, 1985, and five-month policies from December 31, 1985 to May 31, 1986. The London Insurers did not provide any excess coverage to Norfolk between July 11, 1985 and December 31, 1985. Throughout all policy periods, Norfolk chose to self-insure at the primary level and maintained SIRs of at least $1,000,000 per occurrence.[18]

II. PROCEDURAL HISTORY
Norfolk sought a declaration that these policies afforded coverage for the cost of remediating the environmental sites and also sought indemnification from the London Insurers to the extent Norfolk had expended funds to clean up the sites.[19] In response, the London Insurers argued that Norfolk was not entitled to coverage because many of the losses Norfolk sustained were due to damage existing before the first policy took effect in 1969. The London Insurers further contended that any losses Norfolk suffered due to occurrences happening after 1969 did not exceed the SIRs Norfolk maintained under the policies.
The basic issues relating to coverage at the Louisiana sites proceeded to a jury trial in September 1998. The jury ultimately returned a verdict finding coverage in globo under the policies subscribed to by the London Insurers, and the trial court entered a judgment on this verdict on February 19, 1999 (the coverage judgment). In this judgment, which was designated final and appealable, the trial court explicitly retained jurisdiction over several issues and reserved those issues for its determination. The London Insurers filed a timely motion for judgment notwithstanding the verdict and alternative motion for new trial. After a hearing, the trial court took the post-trial motions under advisement.
In October 1999, while the post-trial motions pertaining to the coverage judgment were still under advisement, the trial court conducted a bench trial to address some of the issues over which it had retained jurisdiction in the coverage judgment. These issues included: (1) the amount of costs Norfolk incurred for each site; (2) the London Insurers' "late-notice" defense; (3) the exhaustion of SIRs underlying the policies; and (4) the appropriate allocation methodology, if any, to be applied to the insurance coverage found by the jury's verdict.[20]
*178 On February 12, 2001, the trial court signed a judgment (the allocation judgment) quantifying Norfolk's "ultimate net losses" as $5,335,688.49 at Pearl River and $15,626,418.93 at Bayou Bonfouca. Norfolk did not present any evidence of loss at the Southern Shipbuilding site. The trial court judgment also determined that Norfolk was entitled to full indemnification for its losses at those sites from the policies subscribed to by the London Insurers in any triggered policy period chosen by Norfolk. This indemnification was subject only to the policy limits and payment by Norfolk of a single SIR for the period, without regard to when the damage or damage-causing occurrence actually took place.[21]
Although the post-trial motions challenging the coverage judgment had not yet been ruled on, the London Insurers filed motions for orders of suspensive appeal regarding both the coverage judgment and the allocation judgment. The London Insurers also applied for writs to this court seeking review of the allocation judgment. On July 19, 2001, this court directed the trial court to respond to the post-trial motions, which had been pending since 1999, as well as the motions for orders of appeal filed by the London Insurers.[22] The trial court responded by denying the post-trial motions pertaining to the coverage judgment and granting suspensive appeals from the coverage and allocation judgments.
In July 2001, Norfolk made an ex parte submission to the trial court seeking to designate specific policy periods to satisfy the allocation judgment. In the submission, Norfolk designated three policies, allegedly in effect from April 11, 1969 to April 11, 1970, to satisfy the judgment. On August 21, 2001, while the coverage and allocation judgments were on suspensive appeal, the trial court signed a new judgment (the designation judgment) designating the three policies Norfolk had chosen to satisfy the allocation judgment. The designation judgment further found that Norfolk was entitled to recover $9,898,410.71 from the London Insurers in connection with the Louisiana sites, plus pre-judgment and post-judgment interest. The trial court did not require a contradictory hearing or any supporting proof prior to signing the designation judgment. In addition to the pending appeals of the coverage and allocation judgments, the London Insurers have filed a suspensive appeal of the designation judgment.[23] Norfolk has not appealed any of the judgments or answered any appeal of the London Insurers.
The coverage judgment (2002 CA 0369), the allocation judgment (2002 CA 0371), and the designation judgment (2002 CA 0372) are all currently before us on suspensive appeal. Although the cases have not been consolidated for appeal, the record in the coverage appeal was designated as a master record. Because many of the issues pertaining to each appeal are interrelated, we address them in a single opinion.

III. CONFLICT OF LAWS
Prior to any trial in this matter, the London Insurers filed a motion requesting the trial court to apply the law of Virginia, the state of Norfolk Southern Corporation's domicile, to the claims. After a *179 hearing, the trial court denied the motion and ruled that Louisiana law would govern Norfolk's claims regarding the Louisiana sites.[24] The London Insurers' writ to this court seeking review of that decision was denied.[25] On appeal, Norfolk again argues that a conflict of laws analysis requires the application of Virginia law to the circumstances of this case.
A review of the relevant law of Virginia and Louisiana indicates that there is a genuine conflict between the laws of the two states concerning the issue of the effect of late notice to the insurance company. Under Virginia law, the requirement of timely notice of an accident or occurrence is a condition precedent to an insurance company's liability coverage and requires substantial compliance by the insured. When the failure to provide such notice is "substantial and material," the insurance company is not required to demonstrate that it was prejudiced by the lack of timely notice. See State Farm Fire and Casualty Co. v. Walton, 244 Va. 498, 504, 423 S.E.2d 188, 192 (1992). By contrast, under Louisiana law, a failure to provide timely notice does not act as a bar to coverage absent a showing of prejudice to the insurer. See Kinchen v. Dixie Auto Insurance Company, 343 So.2d 263, 265 (La.App. 1st Cir.), writ denied, 344 So.2d 1057 (La.1977).
According to the London Insurers, application of Virginia law to the claims would result in dismissal of at least some of the claims due to Norfolk's failure to provide timely notice under the terms of the policies. Specifically, the London Insurers contend that Norfolk did not provide notice of the claims regarding the Pearl River site until at least four years after Norfolk was aware of the nature of the claims and the potential liability exposure. The London Insurers further allege that Norfolk failed to provide any notice whatsoever regarding the Pearl River site under certain policies issued to the Norfolk Southern Corporation.
Louisiana's conflict of laws provisions are set forth in Book IV of the Civil Code and provide guidance as to which state's law should apply. Article 3515 of the Civil Code provides the general rule as follows:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
Norfolk has sued the London Insurers seeking a declaratory judgment defining the parties' relative contract rights and obligations pertaining to insurance coverage. The conflict of laws rule applicable to such conventional obligations is found in La. C.C. art. 3537, which provides:

*180 Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.
Application of these factors to the circumstances of this case demonstrates that the law of Virginia is applicable to certain issues in this matter.
Virginia clearly has the more significant contacts with the parties and the transactions at issue in this case. The London Insurers issued the insurance policies in favor of Southern Railway Company and Norfolk Southern Corporation.[26] Southern Railway Company was organized under the laws of Virginia in 1894, and Norfolk Southern Corporation was incorporated in Virginia in 1982. Norfolk and Western Railway Company, which merged with Southern Railway to form Norfolk Southern Corporation, is also a Virginia corporation.[27] All of these companies do business in Virginia. In addition, Norfolk's main casualty and insurance claims offices are located in Virginia, and Norfolk provided notice of its claims regarding these insurance policies from its offices in Virginia. The remaining plaintiffs are all subsidiaries or controlled companies of Norfolk Southern Corporation incorporated in various places throughout the United States. Although some of these parties conduct business in Louisiana, none is incorporated in Louisiana or has its principal place of business in the state.
Moreover, Virginia was the site of the negotiation and delivery of many of the policies at issue here. Norfolk was represented in the negotiations concerning these policies by its brokers in Virginia, Missouri, and London. All of the policies were delivered to Norfolk in either Virginia or Washington, D.C. No negotiations took place in Louisiana, and no policies were delivered to Norfolk in Louisiana.[28]
*181 Virginia has a compelling interest in the regulation of its insurance industry and in the contractual obligations that are inherent parts thereof. The integrity of the contract is a substantial and real interest. The fact that Congress has allowed fifty states to have their own uniform system of regulations governing insurance strongly suggests that this is a legitimate public purpose. Zuviceh v. Nationwide Insurance Company, 00-0773, p. 7 (La.App. 1st Cir.5/11/01), 786 So.2d 340, 346, writ denied, 01-2141 (La.11/9/01), 801 So.2d 373.
In addition, we note that the circumstances of this case are entirely distinguishable from those of In re Combustion, Inc., 960 F.Supp. 1056 (W.D.La.1/15/97), on which Norfolk relies. That suit involved a class action by several thousand individuals seeking damages for both personal injury and property damage arising out of the operations of a CERCLA Superfund hazardous waste site in Livingston Parish. The plaintiffs filed suit against numerous generators and transporters allegedly responsible for the contamination at the site and their insurers. The defendants also filed cross-claims against their insurers.
The court determined that the public policy of Louisiana and the circumstances of the case required that Louisiana law apply to all actions brought pursuant to the Direct Action Statute. In re Combustion, Inc., 960 F.Supp. at 1057. Specifically, the court focused on La. R.S. 30:2002, which declares the maintenance of a healthy and safe environment for the people of Louisiana "a matter of critical state concern." In addition, the court considered certain circumstances of the case to be crucial to the analysis, including the direct effect the contamination had on Livingston Parish and its citizens.[29]In re Combustion, Inc., 960 F.Supp. at 1068.
The case before this court, however, does not involve a direct action by injured Louisiana residents against the insurance companies. The only plaintiffs in this suit are the insureds themselves, and the court is only called on to decide issues concerning the interpretation of contracts between the parties to those contracts. We note that the In re Combustion, Inc. court itself distinguished cases such as this one involving a dispute only between insureds and insurers from those involving direct actions by injured parties. In re Combustion, Inc., 960 F.Supp. at 1070-1071.
Moreover, the insurance policies at issue here are comprehensive general liability policies intended to provide indemnity to Norfolk for liability arising out of the conduct of its business, regardless of the location of the risk. It is true that Norfolk's losses at issue in these appeals occurred in *182 Louisiana and that Louisiana has an interest in ensuring that its environmental sites are remediated;[30] however, no private actions have been filed against Norfolk with respect to any of the Louisiana sites. There is no evidence that any Louisiana resident would be affected by a denial of coverage in this suit, since Norfolk is simply seeking reimbursement for costs it has already paid as response costs ordered by a governmental entity. There is also no evidence that any Louisiana resident has been injured by the contamination at the sites. Therefore, Louisiana's interest in this case only arises because a Virginia corporation, along with certain of its subsidiaries and controlled companies, has filed suit in Louisiana seeking indemnity under insurance policies delivered entirely outside of Louisiana (and primarily in Virginia) to recover payments it has already made as compensation for damage caused to property located in Louisiana. Such an interest is not sufficient to override the compelling interest Virginia has in regulating its insurance contracts. See Shell Oil Company v. Hollywood Marine, Inc., 97-106, 97-611, p. 8 (La.App. 5th Cir.10/15/97), 701 So.2d 1038, 1041.
This conflict of laws analysis notwithstanding, Norfolk contends that Louisiana law should apply in this matter because the London Insurers contractually agreed to the application of the law of the forum in the policies.[31] In so arguing, Norfolk focuses on the following language found in the policies:
It is agreed that in the event of the failure of [the London Insurers] to pay any amount claimed to be due hereunder, [the London Insurers] hereon, at the request of the insured (or reinsured), will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.[32]
Norfolk, relying on Capital Bank and Trust Co. v. Associated Int'l Ins. Co., 576 F.Supp. 1522 (M.D.La.1984), contends that the phrase "and all matters arising hereunder shall be determined in accordance with the law and practice of such Court" means that both the substantive and procedural law of Louisiana are applicable to any action brought in Louisiana by Norfolk to seek recovery under the policies. Such an interpretation would allow an insured to choose the substantive law to be applied to his complaint simply by choosing the forum. Norfolk's reliance on Capital Bank is misplaced.
In Capital Bank, the court was called on to determine whether or not a similar service of suit clause constituted a waiver of the defendant's right of removal to federal court after it had been sued in a state forum chosen by the plaintiff. The clause at issue in that case provided, in pertinent part:
It is agreed that in the event of the failure of the company to pay any amount claimed, to be due, the company at the request of the insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.
Capital Bank, 576 F.Supp. at 1524. Noticeably, the clause did not contain the *183 phrase "and all matters arising hereunder shall be determined in accordance with the law and practice of such Court" on which Norfolk relies.
The Capital Bank court determined that the purpose of such a clause was to allow a policyholder to compel the insurer to submit to the forum of the policyholder's choice in an action to recover proceeds under the policy. The court further reasoned that the insurance company had waived its right to defend the suit in federal court by agreeing to submit to a state forum pursuant to this clause. Capital Bank, 576 F.Supp. at 1524-1525.
The court then attempted to distinguish the clause at issue in its case from others, such as the one before this court, containing the language on which Norfolk relies. The court opined that clauses containing the additional language are not only "choice of forum" clauses but also "choice of law" clauses, which give the insured the additional right to choose the substantive law to be applied to the complaint. Capital Bank, 576 F.Supp. at 1525.
At the outset, we note that any comments by the Capital Bank court regarding the interpretation of the phrase "and all matters arising hereunder shall be determined in accordance with the law and practice of such Court" are dicta, as the clause before that court did not contain that language. Nevertheless, the court did reference two cases in which it believed the service of suit clause at issue, which did contain the additional language, was both a "choice of forum" and "choice of law" clause. See Perini v. Orion Insurance Company, 331 F.Supp. 453 (E.D.Cal. 1971); General Phoenix Corporation v. Malyon, 88 F.Supp. 502 (S.D.N.Y.1949). Despite the court's reference to those cases, however, neither of them even addressed, much less decided, the issue of whether or not the service of suit clause was a "choice of law" clause. The only issue before the Perini and General Phoenix courts was whether or not the clause prevented the defendant from removing the case to federal court from a state forum chosen by the plaintiff.
Furthermore, there is nothing in the clause before us that would indicate that the "law and practice of such Court" does not include the conflict of laws rules of the forum. Under Norfolk's proposed interpretation of the clause, the court chosen by the insured would be required to apply its substantive laws to the dispute without performing an analysis pursuant to its conflict of laws rules. Such an interpretation would have the undesirable effect of allowing the objectionable practice of forum shopping to proceed unchallenged by allowing an insured to simply pick the forum based on the law it believes to be most favorable to its case, without regard for whether or not the forum has any connection to the dispute or the parties. Therefore, we determine that the service of suit clause in the London Insurers' policies at issue here is not a "choice of law" clause, and we are thus compelled to apply Louisiana's conflict of laws rules.[33] As the analysis outlined above demonstrates, Virginia law is applicable to the issue of late notice under the circumstances of this case.[34]
*184 Application of Virginia Law
In the coverage judgment, the trial court reserved the issue of the London Insurers' late notice defense for its determination. The London Insurers subsequently filed a post-trial brief concerning this issue; however, the trial court never ruled on the issue prior to signing the allocation or designation judgments.[35] A review of the evidence in the record demonstrates, however, that Norfolk did substantially comply with its notice requirements under the policies.
In most of the policies, Norfolk was required to give notice to the London Insurers in compliance with the following clause:
The assured shall immediately give written notice as stated in item 7 of the schedule of underwriters' representatives of any occurrence or claim which could reasonably be anticipated by the assured to involve an amount in excess of the underlying limits should the assured be ultimately held legally liable for the occurrence or claim. Solely for the purpose of reporting claims or occurrences, the assured shall in all instances consider himself legally liable for such claims or occurrences.
Unlike provisions in other policies that provide simply that the notice must be immediate, the policies at issue here required that notice be provided when the assured could reasonably anticipate that the claim or occurrence would involve an amount in excess of a certain threshold.[36]
The London Insurers contend that Norfolk was aware of problems at the Pearl River site as far back as 1974, when it received complaints from certain residents around the site. In addition, the London Insurers argue that Norfolk provided notice of the existence of the site to the EPA in 1983, but failed to provide notice to the London Insurers until 1987, four years later. According to the London Insurers, these events demonstrate that Norfolk was aware of the problems at Pearl River and could have reasonably anticipated that its liability at the site would exceed the notice thresholds established by the policies for many years prior to the time Norfolk actually provided notice to the London Insurers. We disagree.
While the record does indicate that certain residents did complain to Norfolk about the operation of the Pearl River facility in the 1970s, there is no evidence in the record that any resident initiated any legal action against Norfolk or PRWPC in connection with these complaints.[37] Moreover, although Norfolk notified the EPA of a potential problem at the site in 1983, the LDEQ did not issue any order directing Norfolk to participate in the remediation of the site until 1987, and Norfolk provided notice to the London Insurers shortly after the order was issued. Although the four-year *185 period from Norfolk's notification of the EPA to the notification of the London Insurers was certainly not "immediate," there is simply no evidence in the record to establish that Norfolk could have or should have been able to value its liability exposure as greater than the thresholds established in the policies at any point prior to the time Norfolk actually provided notice to the insurers. The evidence in the record indicates, therefore, that Norfolk has adequately complied with the notice requirements of the policies.

IV. JUSTICIABLE CONTROVERSY

(As to Bayou Bonfouca and Southern Shipbuilding Sites)
Norfolk petitioned for a declaratory judgment on the issue of coverage under the policies, as well as for indemnity to the extent it had expended funds to remediate the sites. At the time of the jury trial, Norfolk had not expended any funds for the remediation of the Bayou Bonfouca and Southern Shipbuilding sites and was only seeking declaratory relief regarding those sites.
In American Waste & Pollution Control Company v. St. Martin Parish Police Jury, 627 So.2d 158, 161 (La.1993), the Louisiana Supreme Court discussed the use of declaratory judgment as follows:
Due to its nature, declaratory relief makes it possible to adjudicate a grievance at an earlier time than would otherwise be allowed. The purpose of the judgment is to settle and afford relief from uncertainty and insecurity... before damages arise and the need for traditional remedies occurs. Like actions for conventional judgments, basic to the exercise of procedures for declaratory relief, the action must present a justiciable controversy. [Citations omitted.]
In Abbott v. Parker, 259 La. 279, 249 So.2d 908, 918 (1971), the Louisiana Supreme Court defined justiciable controversy in the context of an action for declaratory relief as follows:
A `justiciable controversy' connotes... an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of conclusive character. Further... the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
A declaratory judgment cannot generally be maintained unless it involves some specific adversary question or controversy based on an existing state of facts. Tugwell v. Members of Board of Highways, 228 La. 662, 679, 83 So.2d 893, 899 (1955). A court must refuse to entertain an action for a declaration of rights if the issue presented is based on a contingency that may or may not arise. Cases submitted for adjudication must be justiciable, ripe for decision, and not brought prematurely. American Waste & Pollution Control Company, 627 So.2d at 162; See also Jordan v. Louisiana Gaming Control Board, 98-1122, 98-1133, 98-1134 (La.5/15/98), 712 So.2d 74; Perschall v. State, 96-0322 (La.7/1/97), 697 So.2d 240; Lifemark Hospitals v. St. Jude Hospital of Kenner, La., Inc., 98-476 (La.App. 5th Cir.10/28/98), 720 So.2d 1244, writ denied, 98-2940 (La.1/29/99), 736 So.2d 831.
The testimony at trial was that Norfolk had received one letter from the EPA seeking information about Norfolk's connection to the Southern Shipbuilding site. The letter alleged only that Norfolk might be a PRP in connection with the site *186 because it may have had some vessels serviced at the site at some unknown time in the past. Norfolk conceded that it may have owned a couple of fire boats and platform barges that may have been serviced at the facility, but denied that this servicing resulted in the production of any hazardous materials. Moreover, it was not clear when, or if, the vessels had actually been serviced at the facility. In addition, Norfolk had advised the EPA that it had confused Norfolk with another company and had not received any further communication from the EPA regarding the site at the time of trial. No claim has been filed against Norfolk in connection with this site by the EPA or any other entity.
Clearly, the claims regarding the Southern Shipbuilding site are too hypothetical and abstract to allow the granting of declaratory relief. The only facts alleged in support of Norfolk's potential liability at the site are speculative at best. Furthermore, no entity has sought to hold Norfolk liable in connection with the site, and no entity may ever seek to impose liability. Therefore, the question of insurance coverage is based on a contingency that may never occur and is not of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. American Waste & Pollution Control, 627 So.2d at 162. In addition, the facts allegedly supporting Norfolk's liability at the site would not be sufficient, even if proven, to demonstrate that an "occurrence" had taken place during any policy period. Because a justiciable controversy is lacking, we reverse the trial court judgment finding coverage in connection with the Southern Shipbuilding site, and dismiss the portion of the petition seeking declaratory relief for the site as failing to state a cause of action. See American Waste & Pollution Control, 627 So.2d at 162.
On the other hand, we believe that Norfolk's claim for declaratory relief in connection with the Bayou Bonfouca site is proper. At the time of the jury trial in this matter, the EPA had filed a cost recovery action under CERCLA against Norfolk regarding the site. That action alleged specific facts and specific theories of liability upon which Norfolk's potential liability was based. Although there was a hypothetical component to the claims since Norfolk's liability pursuant to those facts had not yet been determined, the jury was allowed to determine whether or not coverage would exist if Norfolk were held liable for the remediation of the site pursuant to the theories of liability propounded by the EPA. Therefore, we believe that the controversy was sufficiently certain and immediate to allow its resolution by declaratory relief.

IV. INSURANCE COVERAGE
The trial court signed the coverage judgment on February 19, 1999, based on the jury verdict rendered in September 1998. The signed judgment incorporated the interrogatories provided to the jury on the verdict form, as well as the jury's responses. In challenging this judgment, the London Insurers have focused largely on alleged deficiencies in the jury verdict form.

A. Jury Verdict Form
The verdict form required the jury to answer two questions concerning each of the three Louisiana sites. Specifically, the jury was asked the following questions about each site: (1) Do you find that the policies which defendants sold to plaintiffs provided coverage to plaintiffs for the costs that plaintiffs incurred, or may incur in the future, for the remediation and clean up of the [site]; and (2) Do you find that the policy years between *187 1969 and 1985 provide coverage for the plaintiffs' loss at the [site].[38] The jury was only allowed to answer the questions with either "yes" or "no." There was no provision in the interrogatories to allow the jury to determine whether any portion of the damage existed prior to the effective date of the first policy, despite the fact that the issue was raised in the pleadings, the pre-trial order, the evidence at trial, and the jury instructions given by the trial court. The London Insurers contend that the failure of the trial court to allow the jury to decide this issue is reversible error. We agree.
In order to establish its claim, Norfolk was required to demonstrate by a preponderance of the evidence that the property damage for which it sought coverage was due to occurrences taking place during a policy period.[39] In this case, there was no question that some contaminating activities and property damage had occurred at the sites prior to April 11, 1969, the effective date of the first insurance policy. Norfolk's fourth amending petition had alleged that relevant contaminating activities had taken place at all three sites prior to the first policy period. In addition, Norfolk's risk manager, David Fries, acknowledged at trial that the contamination at the sites dated back to the time when the facilities began their operations. Mr. Fries further testified that Norfolk was seeking to recover the costs it had paid to remediate all of the property damage, regardless of when the damage or the damage-causing occurrence took place. The London Insurers, on the other hand, contended that any damage that pre-existed the first policy period was not covered because it could not have arisen out of an occurrence happening during a policy period.
Despite the obvious importance of the issue to the parties' claims and the repeated objections of the London Insurers, the trial court did not include any interrogatories in reference to the issue on the verdict form presented to the jury.[40] Instead, the jury was presented with an "all or nothing" choiceeither all of the property damage was covered or none of it was. The jury was not allowed to distinguish between damage resulting from occurrences happening during uninsured years and damage resulting from occurrences happening during policy years.
In addition, the second interrogatory regarding each site allowed the jury only an affirmative or negative response to the question of whether policy years between 1969 and 1985 covered Norfolk's losses at the sites. Such an interrogatory is clearly confusing because the jury may properly answer in the affirmative if coverage is found in all policy years, as well as if coverage is found in only one policy year. By requiring the jury to answer the interrogatory with a simple "yes" or "no," the jury verdict form did not contemplate all possible responses; therefore, we are unable to determine the jury's intent. Moreover, the confusing and misleading nature *188 of the jury interrogatories was exacerbated when the trial court instructed the jury that the London Insurers bore the burden of proof in apportioning the damages in the dispute with Norfolk, without providing a mechanism by which the jury could carry out the apportionment.[41]
A special jury verdict requiring a jury to return a special written finding on each issue of fact requires adequate jury interrogatories that fairly and reasonably point out the issues and guide the jury in reaching a verdict. If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267, 274 (La.App. 3d Cir.1989). Because of the deficiencies in the verdict form, we find that the jury interrogatories were so inadequate that the jury was unable to reach a verdict based on the law and facts. Accordingly, we are compelled to interdict the entire jury verdict.[42] See Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089, p. 7 (La.App. 1st Cir.6/23/95), 657 So.2d 1066, 1070, writ denied, 95-1883 (La.11/17/95), 663 So.2d 720.
As an appellate court we now have the option of remanding the case for a new trial or deciding the case on the record. In order to exercise the option correctly, we must review the record before us. When an appellate court finds that a reversible legal error or clear error of material fact was made in the trial court, it is required, whenever possible, to review the case de novo from the entire record and render a judgment on the merits. Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. When a preponderance of the evidence cannot be determined fairly from the cold record, such as when there is a substantial conflict in the testimony that cannot be determined without deciding on the credibility of the witnesses, remand is proper. Diez, 94-1089, p. 7, 657 So.2d at 1070-1071; Citgo Petroleum Corporation v. Yeargin, Inc., 95-1574, p. 8 (La.App. 3d Cir.2/19/97), 690 So.2d 154, 161, writs denied, 97-1223, 97-1245 (La.9/19/97), 701 So.2d 169, 170. In the present case, we find that the record is such that we can fairly find a preponderance of the evidence from the record on appeal; therefore, we will render a judgment on the record.

*189 B. Pre-existing Damage

An insurance policy is a conventional obligation that constitutes the law between the insured and insurer, and the agreement governs the nature of their relationship. La. Civ.Code art.1983. The extent of coverage is determined from the intent of the parties as reflected by the words of the insurance policy. Peterson v. Schimek, 98-1712, p. 4 (La.3/2/99), 729 So.2d 1024, 1028. The role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the insured and insurer as reflected by the words in the policy. La. Civ.Code art.2045; Succession of Fannaly v. Lafayette Insurance Co., 01-1144, 01-1343, 01-1355, 01-1360, p. 3 (La.1/15/02), 805 So.2d 1134, 1137. When the words of an insurance contract are clear and explicit and lead to no absurd consequences, the court must enforce the contract as written and may make no further interpretation in search of the parties' intent. La. Civ.Code art.2046; Central La. Elec. Co. v. Westinghouse Elec. Corp., 579 So.2d 981, 985 (La.1991).
In determining the meaning of the words of an insurance policy, the words are to be given their generally prevailing meaning. When the meaning of the words is clear, the court should look no further in determining the intent of the parties. Schroeder v. Board of Supervisors of La. State Univ., 591 So.2d 342, 345 (La.1991). Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty, 93-0911, p. 5 (La.1/14/94), 630 So.2d 759, 764.
Furthermore, an insurance contract should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or to achieve an absurd conclusion. Valentine v. Bonneville Ins. Co., 96-1382, p. 3 (La.3/17/97), 691 So.2d 665, 668; Reynolds v. Select Properties, Ltd., 93-1480, p. 3 (La.4/11/94), 634 So.2d 1180, 1183. That is, the rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express the parties' intent with sufficient clarity. Ledbetter v. Concord Gen. Corp., 95-0809, pp. 3-4 (La.1/6/96), 665 So.2d 1166, 1169, amended by, 95-0809 (La.4/18/96), 671 So.2d 915. Absent a conflict with statutory provisions or public policy, insurers are entitled to limit their liability and to impose and enforce reasonable conditions upon the policy obligations they contractually assume. Louisiana Ins. Guar. Ass'n, 630 So.2d at 763.
As previously noted, the policy language provided that the London Insurers would indemnify Norfolk for the amounts Norfolk was legally liable to pay as damages due to "property damage... arising out of occurrences happening during the policy period." The term "occurrence" was most commonly defined in the policies as "one happening or series of happenings arising out of or due to one event." The term "property damage" referred to damage to, or destruction or loss of property not owned by or in the care, custody, or control of Norfolk. The policies did not require that the property damage take place during the policy period in order for it to be covered; however, the unambiguous language of the policies clearly required that the "occurrence" giving rise to the property damage must have taken place during the policy period.
*190 Norfolk argues that the policies cover all losses due to property damage it suffered at the sites, regardless of whether the damage pre-existed the effective date of the first policy. No reasonable interpretation of this provision would consider property damage already in existence at the time the first policy came into effect to have been caused by an occurrence happening during any policy period. Such an interpretation would have the absurd consequence of allowing the property damage to, in effect, pre-exist its causative event. To interpret the provision in this manner would be a perversion of the clear and unambiguous language of the policy and would enlarge coverage beyond what the parties could reasonably have expected. Therefore, we find there can be no coverage for property damage that existed prior to April 11, 1969, the effective date of the first policy.[43]

C. Trigger of Coverage[44]
A review of the record indicates that the property damage for which Norfolk sought coverage at the Bayou Bonfouca and Pearl River sites was the contamination arising out of the long-term wood-preserving operations carried out at the site over the course of many years. The evidence is clear that the contaminating activities at Bayou Bonfouca began in 1882, and ended by 1972, when the facility was closed. Similarly, the contaminating activities at Pearl River began in 1963, and ended by 1974, when the creosoting operations were moved to Mississippi. The operations at both sites resulted in the routine deposit of contaminants onto the ground and into waterways throughout the periods that the facilities were in operation. The contaminants were not removed from the sites for many years after the facilities were closed. Thus, the contaminants continued to travel across the surface of the land and leach into the soil and groundwater for years after the time they were initially deposited.
Fixing the date of an injurious occurrence is crucial to determining which of several insurers in a company's history must bear the liability for an environmental incident. Injuries from toxic wastes usually evolve slowly, and thus it is difficult to define the date on which an occurrence triggers liability for insurance purposes. Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 450, 650 A.2d 974, 980 (1994). Therefore, in long-term environmental damage and other complex causation cases, courts have utilized various theories to determine when an insurance policy has been triggered.[45] The four primary theories *191 developed by the courts are: (1) the exposure theory, in which the policy is triggered by the mere exposure to the harmful conditions during the policy period (i.e. when the toxin is deposited in the landfill during the policy period);[46] (2) the manifestation theory, in which the policy is triggered when the injury becomes reasonably apparent or known to the claimant;[47] (3) the continuous trigger theory, in which all policies in effect during the entire injurious process will be triggered and required to respond (i.e. when the environment is first exposed to the toxic chemical, at the time the damage first becomes apparent, and at all times in between);[48] and (4) the injury-in-fact theory, in which the policy is triggered when there is evidence of actual injury during the policy period regardless of when exposure took place or the injury became manifest.[49]
Louisiana courts have never addressed the issue of trigger of coverage in the context of long-term environmental damage; however, in the context of asbestosis or long-latency disease cases, the Louisiana Supreme Court has adopted the exposure theory. Cole v. Celotex, Corp., 599 So.2d 1058, 1076 (La.1992).[50] In doing so, the court discussed the difficulties inherent in trying to apply traditional tort liability doctrines to long-latency diseases:
The difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which the damage results from a single identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous processa slow development of this hidden disease over the years. Compounding the problem, asbestosis cases are characterized by a lengthy latency periodtypically ranging a decade or twoand, consequently, a tortious conduct and the appearance of injury. This lengthy latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally.
Cole, 599 So.2d at 1065-1066. [Citations omitted.] The court then went on to conclude that the "key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious *192 exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later." Cole, 599 So.2d at 1066.
These same concerns apply to matters involving long-term environmental damage. In such cases, the property damage is generally not due to a single catastrophic event, but to numerous releases and discharges taking place over an extended period of time. The property damage may or may not be apparent immediately, and it is virtually impossible to determine the specific damage in existence at any given time or the specific cause of any particular damage. Therefore, considering the characteristics of long-term environmental damage, the relevant policy language, and the facts of this case, we believe the exposure theory is applicable to determine which policies, if any, were triggered.
Under the facts of this case, wood-preserving operations occurred in every year from 1882 to 1972 at the Bayou Bonfouca site, and every year from 1963 to 1974 at the Pearl River site. The London Insurers provided excess liability coverage to Norfolk from 1969 to 1986. Therefore, application of the exposure theory would result in triggering the policy periods from 1969 to 1972 in connection with the Bayou Bonfouca site, and the policy periods from 1969 to 1974 in connection with the Pearl River site. After the facilities were closed, there were no new occurrences giving rise to the relevant property damage.
We must also resolve the question of the number of occurrences taking place in each policy period. The evidence indicates that there were numerous releases, drips, and spills as a normal part of the wood-preserving operations in each year the sites were operational; however, it is not known how many took place in each year. In the asbestos context, the Louisiana Supreme Court has addressed the issue of how to determine the number of occurrences when the victim is repeatedly injured during multiple policy years. In Cole, the court applied the exposure theory to find that the inhalation of asbestos fibers causes bodily injury as defined in the policies. The court then held that an employee suffered bodily injury from an occurrence when the employee inhaled asbestos fibers during a policy period, and all subsequent inhalation during that policy period arose out of the same occurrence. The court went on to find that when the employee inhaled asbestos during the next policy period, the employee again suffered bodily injury from an occurrence. Therefore, there was one occurrence per policy period, and the employee suffered injury from an occurrence during each year in which he inhaled the asbestos fibers. Cole, 599 So.2d at 1075-1080.
We believe the same rule would apply to the facts of this case. Like Cole, we have applied the exposure theory to determine when a policy has been triggered by an occurrence. Moreover, we believe this interpretation comports with a literal reading of the policy language defining an "occurrence" as "one happening or series of happenings arising out of or due to one event." To the extent that the releases, drips, and spills were due to the wood-preserving operations in one policy period they are to be considered as one occurrence. Therefore, a single occurrence took place in each policy period from 1969 to 1972 at the Bayou Bonfouca site, and a single occurrence took place in each policy period from 1963 to 1971 at the Pearl River site; however, a single additional occurrence took place at the Pearl River site in the policy period covering the period from 1972 to 1974, because the policies covering that period were three-year policies. See Society of the Roman Catholic *193 Church v. Interstate Fire & Casualty Co., 26 F.3d 1359, 1366 (5th Cir.1994).

D. Coverage in Triggered Years
Finding that a policy has been triggered does not end the inquiry into whether or not coverage exists under that policy. We must now consider additional policy terms, including any limitations, exclusions, or defenses the insurer may have.

1. Owned Property Exclusion
The London Insurers agreed to indemnify Norfolk for damages and expenses due to property damage. The policies defined property damage to exclude damage to property owned by Norfolk or in its care, custody or control. There is no dispute that Norfolk owned the property comprising the Pearl River site from approximately 1882 until 1980.[51]
The purpose of owned property exclusions in general liability policies is to effectuate the intent that liability insurance is designed to provide compensation for damages to property not owned or controlled by the insured. It does not provide first party coverage for losses sustained by the insured on its own property. The exclusion is applied because there may be some advantage to the insured in falsifying or exaggerating a loss to its own property; a moral hazard not contemplated or contracted for in a commercial general liability insurance policy. Reynolds v. Select Properties, Ltd., 93-1480 at p. 5, 634 So.2d at 1184.
The property damage at the site consisted primarily of soil and groundwater contamination. While the soil contamination appears to have been contained within the boundaries of the property, the groundwater contamination extended beyond those boundaries and across Interstate 59. Norfolk installed various wells to monitor the condition of the groundwater but did not actually treat the contaminated groundwater. In addition, Norfolk excavated and removed the contaminated soils in the areas of the earthen pits and the large surface impoundment, both of which were located on the property that had been owned by Norfolk. These areas were the two main source areas of contamination at the site.
Ownership of groundwater has not been clearly established in Louisiana law; however, at least one Louisiana court has treated groundwater as a fugitive subsurface mineral, which is not owned by the owner of the land. Adams v. Grigsby, 152 So.2d 619, 623 (La.App. 2d Cir.), writ refused, 244 La. 662, 153 So.2d 880 (1963). Therefore, it appears that costs expended in connection with efforts to remediate damage to the groundwater, whether it was below Norfolk's property or third-party property, would not be excluded from coverage pursuant to the owned property exclusion because such groundwater is not owned by the insured. This determination does not resolve the question of to what extent the remediation efforts involving the contamination on Norfolk's property would be covered under the policies. Louisiana courts have never addressed this issue; however, courts in other jurisdictions have, on occasion, found that the owned property exclusion does not defeat coverage of the remediation of an insured's property undertaken to eliminate or mitigate a threat to third-party property.
*194 Courts in other jurisdictions have abrogated the owned property exclusion in certain cases where there is evidence of a verifiable, actual, and imminent threat to groundwater or adjacent property not owned by the insured. In Intel Corp. v. Hartford Accident & Indemnity Co., 952 F.2d 1551, 1565 (9th Cir.1991), the court opined that an insured covered for damage to third-party property would reasonably expect coverage for efforts to mitigate that damage, even when the source of the problem emanates from the insured's own property. Even in such cases, however, the courts have abrogated the exclusion only to the extent that the costs were incurred either to remedy existing damage to third-party property or to prevent future damage to such property. Costs incurred solely to remediate damage to the insured's property were not covered. Intel Corp., 952 F.2d at 1566; Figgie International, Inc. v. Bailey, 25 F.3d 1267, 1273-1274 (5th Cir.6/29/94).[52]
Other courts, however, have determined that the owned property exclusion does operate to preclude recovery for costs expended to prevent only threatened harm to third-party property, even if future harm to third-party property was prevented. See e.g. State v. Signo Trading International, Inc., 130 N.J. 51, 612 A.2d 932, 938-939 (1992). The court further determined that the insurer's obligation did not extend to prospective monetary damages for some undefined and speculative future loss. The court did acknowledge, however, that where there had been actual injury to third-party property, the costs of measures intended to prevent imminent or immediate future damage to that property would not be excluded from coverage. Signo Trading, 612 A.2d at 939.
The London Insurers acknowledge that a portion of the costs Norfolk expended to remediate the site was spent in conducting groundwater investigations and installing the monitoring wells.[53] The London Insurers contend, however, that the remaining costs of remediation were incurred only to improve Norfolk's own property and are, therefore, excluded from coverage by the owned property exclusion. We disagree.
There is clear evidence in the record of actual damage to third-party property as the groundwater both on-site and off-site had been contaminated. The evidence further indicated that the groundwater contamination emanated from the earthen pits and the large surface impoundment as the contaminants in those two areas continued to leach through the soil and into the groundwater. At trial, Norfolk contended that the first step in any remediation effort is to remove the source areas of contamination and that all of the costs it incurred were for the purpose of addressing the groundwater contamination and removing the sources of contamination. It is only logical to conclude that if the source were not removed, the contamination, which had already caused damage to third-party property, would continue to migrate off-site and cause additional damage to third-party property. Therefore, under the circumstances of this case, we hold that the remediation costs expended in removing the source areas of contamination on Norfolk's property were intended to prevent imminent or immediate damage to the groundwater. The evidence in the record is clear that actual third-party *195 property damage had occurred and that the costs expended by Norfolk were spent to prevent future damage from occurring, rather than solely to repair damage to Norfolk's own property. Norfolk's costs in connection with the Pearl River site are not excluded from coverage pursuant to the owned property exclusion. Because actual damage to third-party property was demonstrated, we need not address the situation in which remediation is undertaken in response to the mere threat of damage to third-party property.

2. Conduct of the Assured's Business

The London Insurers also contend that Norfolk is not entitled to indemnity because the losses Norfolk suffered were not "due to the conduct of the Assured's business." We disagree.
Norfolk's liability in connection with the Pearl River site is based on its position as the owner of the property at the time hazardous wastes were disposed of at the site.[54] Norfolk's real estate counsel, Jerry Causey, testified at the jury trial that Norfolk often leased vacant property to other companies, such as PRWPC, in order to obtain customers for Norfolk's rail service. Such leases were usually for a very small amount to attract industry that would utilize the railroad.
Similarly, at the Bayou Bonfouca site, Norfolk's liability was based in part on its ownership of a right-of-way into the site. This right-of-way allowed Norfolk to provide rail service to the industries at the site, which in turn allowed Norfolk to obtain freight business. Therefore, we find that Norfolk's liability at the sites arose out of the conduct of its business.

V. ALLOCATION METHOD
After the jury entered its verdict on coverage, the trial court conducted a bench trial to determine how coverage would be allocated among the various triggered policies in light of the jury verdict. Norfolk contended that the court should apply the "all sums" or "pick-a-year" method of allocation by which Norfolk would be allowed to obtain full indemnification for all its losses in connection with the Louisiana sites from any triggered policy it chose, subject only to the policy limits and the payment of one SIR for the period. The London Insurers argued, on the other hand, that the proper method of allocation was a pro rata approach based on each insurers' time on the risk and degree of risk assumed.
The trial court took the matter under advisement and ultimately determined that the "all sums" method was the appropriate method of allocation to be applied to this matter. Norfolk ultimately chose to satisfy its losses from the policies in effect from April 11, 1969 to April 11, 1970, and obtained the ex parte designation judgment to that effect. On appeal, the London Insurers argue that the "all sums" method is contrary to the policy language and the law. We agree and hereby reverse.[55]
*196 A. Policy Language Requires Pro Rata Approach
The trial court did not issue any oral or written reasons for its decision to apply the "all sums" method of allocation, but it appears that the court may have focused on the "all sums" portion of the coverage grant to the exclusion of the remaining language, which required that the property damage for which indemnity was sought must have arisen out of an occurrence taking place during the policy period.[56] The well-established rules of contract interpretation do not allow such a construction of the terms of the policy. An insurance contract must be construed as a whole, and each provision in the policy must be interpreted in light of the other provisions so that each is given meaning. One portion of the policy should not be construed separately at the expense of disregarding other provisions. La. Civ.Code art.2050; Peterson, 98-1712 at p. 5, 729 So.2d at 1029.
In this case, the unambiguous language of the policies clearly demonstrates that the policies are triggered by an occurrence that causes property damage. Moreover, each policy triggered by an occurrence within its policy period covers only the property damage arising from that occurrence. An interpretation of the coverage grant that would require any of the policies to respond to property damage caused by occurrences happening outside the policy period would be an unreasonable enlargement of the terms of the policy.

B. Louisiana Law Requires Pro Rata Approach
Although the trial court purportedly applied Louisiana law to the issue, it did not cite any Louisiana authority in support of its determination that the "all sums" method of allocation was appropriate. Moreover, despite advocating the application of Louisiana law, Norfolk has relied primarily on a line of cases from other jurisdictions that have been expressly rejected by Louisiana courts.
Many of the authorities on which Norfolk relies have their roots in the approach taken by the court of appeals for the District of Columbia in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981). In Keene, the court applied the continuous trigger theory in the context of long-latency occupational disease and found that all insurance policies in effect from the injured party's initial exposure to asbestos, through the period of exposure in residence, to the manifestation of the disease were triggered. Keene, 667 F.2d at 1047. The court went on to hold that the insurers' liability to the plaintiff was joint and several, such that the plaintiff was entitled to select one of the triggered policies and collect the full amount of indemnification from that policy. Once the plaintiff had been fully compensated, the insurers were responsible for allocating the loss among themselves. Keene, 667 F.2d at 1049-1050. Although Keene and its progeny appear to provide support for the "all sums" method, Louisiana courts have expressly rejected Keene *197 and its application of the continuous trigger theory and joint and several liability in the context of long-latency occupational diseases. Cole, 599 So.2d at 1079; Ducre v. Mine Safety Appliances, Co., 645 F.Supp. 708, 712-713 (E.D.La.1986), aff'd 833 F.2d 588 (5th Cir.1987).
In Cole, the Louisiana Supreme Court considered a suit filed by refinery workers against their employer and its insurer based on the employees' exposure to asbestos during the time of their employment. The court affirmed the decision of the third circuit, which had applied the exposure theory to determine that multiple policies had been trigged throughout the full period of exposure. The supreme court then rejected the insurer's attempt to allocate the entire loss to one policy year pursuant to Keene and quickly distinguished Keene based on its application of a continuous trigger theory rather than the exposure theory employed by Louisiana courts. In making this distinction, the court focused on the policy considerations underlying the exposure theory and stated:
The general economic effect of the exposure theory is to spread losses back over numerous years of primary insurance coverage, with the result that manufacturers, particularly those which are no longer in the asbestos business, will not be faced with increased liability insurance costs. It is also, however, a clear benefit to the more recent excess insurers, which will not be forced to make indemnity payments since all applicable primary limits will not be exhausted as rapidly as they would be under a manifestation approach.
Cole, 599 So.2d at 1079.
Prior to Cole, Louisiana federal courts had addressed these issues as well. In Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), the fifth circuit accepted the exposure theory as the law of Louisiana and ordered the matter before it remanded to the district court for proration of liability. The fifth circuit guided the district court in the manner of proration by reference to Insurance Company of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1225 (1980), in which the federal sixth circuit held that liability should be prorated among all insurance carriers based on the number of years each provided coverage; however, the court specified that an insurer would not be liable for any period in which there had been no exposure to asbestos manufactured by the insured. See Porter, 641 F.2d at 1145.
In Ducre, injured employees filed suit for damages arising out of exposure to silica dust over a period of many years. The court rejected the insurance company's attempt to telescope coverage into one policy period pursuant to Keene and held that liability would be prorated on a yearly basis. Under such an approach, each insurance company would be on the risk for each plaintiff asserting a claim, for each policy period that the plaintiff was exposed to silica dust. Ducre, 645 F.Supp. at 712-713. The court further determined that this allocation would be carried out by dividing the amount of the judgment by the total number of years of a plaintiff's exposure to obtain a judgment amount per year. Ducre, 645 F.Supp. at 714. Both Porter and Ducre were relied upon by the Louisiana Supreme Court in Cole.
Louisiana courts have never addressed the issue of allocation in the context of long-term environmental damage; however, there is no relevant distinction between the cumulative nature of the bodily injuries in long-latency occupational diseases and that of the property damage in long-term environmental contamination. Therefore, as we have already applied the exposure *198 theory to these matters, we now adopt the logically consequent rule of proration of liability for the insurance carriers on the risk during the periods of exposure to contaminating activities. See Porter, 641 F.2d at 1145.
In addition, we believe that this liability should be allocated on a pro rata basis over all periods in which contaminating activities took place, including those in which Norfolk was uninsured.[57] Underlying the holdings in the Louisiana cases addressing allocation in long-term losses spanning multiple policy periods is the concept that insurers may limit their liability to discrete and finite periods. The exposure theory, upon which the Louisiana allocation approach is based, relies on the principle that an insurer will only be responsible within the terms of its policy for those damages arising out of the period the policy is in effect. In short, each insurer is responsible, up to the limits of its policy, for all damages emanating from occurrences taking place during the insurer's policy period. All damages emanating from occurrences taking place outside the policy period are covered by the insurer on the risk at the time the occurrence took place. Society of the Roman Catholic Church, 26 F.3d at 1366. To the extent Norfolk's damages arose out of occurrences taking place during a period in which no insurer is on the risk, the logical approach is to treat Norfolk as an insurer for that period and assign it a pro rata share.
We note that in Forty-Eight Insulations, on which many of the relevant Louisiana authorities are based, the sixth circuit recognized that an insured must pay a pro rata share of the damages for the periods in which it was self-insured. To hold otherwise, the court reasoned, would have the illogical result of placing an insured that had purchased insurance coverage for only one year of the twenty years of exposure in the same position as an insured who had purchased insurance coverage continuously throughout the exposure period. Forty-Eight Insulations, 633 F.2d at 1225.
If the number of releases and discharges were known and the damages arising from each one proven, we could allocate the loss according to the actual damage arising out of each occurrence. Unfortunately, there is no measure of the amount of damage caused by occurrences during any given period. This leaves us with only one avenue under the language of the policies, which is to allocate the loss based on the policy periods and all periods of self-insurance. See Society of the Roman Catholic Church, 26 F.3d at 1366-1367.

C. Bayou Bonfouca Site
Under the facts of this case, the ultimate net loss of $15,626,418.93 suffered by Norfolk in connection with the Bayou Bonfouca site must be allocated among all years from 1882 to 1972, for a total of ninety-one years.[58] This results in a per year allocation of $171,718.89. Norfolk is responsible for those amounts allocable to the periods from 1882 through April 10, 1969, when it was not insured. In addition, Norfolk must meet its SIR in every policy period from April 11, 1969 through 1972, as required by the terms of the policy. It is clear, however, that the amount allocable to each of the policy periods *199 is not sufficient to exceed even one SIR.[59]
Norfolk contends on appeal that the fire on the site that occurred in 1970 or 1972 fully accounts for the costs of remediation. We reject this argument for a variety of reasons. First, we note that the date of the fire has not been proven with any certainty, thus preventing the allocation to one policy period of the costs associated with the fire.[60] Furthermore, this assertion is contrary to the testimony of Norfolk's witnesses that it was not possible to determine when certain damage occurred or to which "occurrence" it was attributable. Finally, the evidence in the record points to the cause of the contamination being more from a long-term process of contamination rather than a one-time event. Therefore, under the facts of this case and considering the per year judgment amounts calculated above, the London Insurers do not owe any indemnification with regard to the Bayou Bonfouca site.

D. Pearl River Site
Allocation in connection with the Pearl River site is slightly different because in addition to various one-year policies, a three-year policy running from April 11, 1972 to April 11, 1975, has been triggered by the contaminating activities carried out at the site; however contaminating activities did not take place throughout that three-year period. The record indicates that the Pearl River Wood Preserving facility operated for a total of 127 months, with approximately 71 months of operations having occurred by April 11, 1969. Therefore, approximately 56 months of the facility's operations were carried out during periods in which there was coverage. Norfolk alleges that its ultimate net loss in connection with this site is $5,335,688.49, which averages out to $42,013.30[61] per month of operations. Norfolk is responsible for those costs allocable to the 71 months of operations that took place prior to the effective date of the first policy. This total comes to $2,982,943.95. The sum of $504,159.54 is allocable to each of the three one-year policy periods running from April 11, 1969 to April 11, 1972. Finally, the sum of $840,265.90 is allocable to the one three-year policy period during which the remaining 20 months of operations took place.[62] The policies each had SIRs of $1,000,000 per occurrence, and as the calculations make clear, the amount allocable to each policy period does not exceed the relevant SIR. Therefore, the London Insurers do not owe Norfolk any indemnification in connection with the Pearl River site.[63] Because we have determined that *200 the London Insurers do not owe any indemnification in connection with the Louisiana sites, we must also reverse the designation judgment, which was rendered and signed on August 21, 2001.

CONCLUSION
For the foregoing reasons, we reverse the coverage judgment of the trial court, and judgment is hereby rendered in favor of the plaintiffs, Norfolk Southern Corporation, Norfolk Southern Railway Company, Norfolk and Western Railway Company, The Alabama Great Southern Railroad Company, Southern Region Industrial Realty, Inc., Central of Georgia Railroad Company, and The Cincinnati, New Orleans and Texas Pacific Railway Company finding coverage under the policies from 1969 to 1972 with regard to the Bayou Bonfouca site, and from 1969 to 1974 with regard to the Pearl River site. We further find that there is no coverage for the property damage at either site under the remaining policies, and that there is no coverage under the policies for damage that pre-existed the policies.
We further affirm that part of the allocation judgment finding the plaintiffs' ultimate net loss at the Bayou Bonfouca site to be $15,626,418.93, and the ultimate net loss at the Pearl River site to be $5,335,688.49; however, we reverse that part of the decision allocating the losses utilizing the "all sums" theory, and judgment is hereby rendered ordering the allocation of the losses on the basis of each insurers' time on the risk and degree of risk assumed. Judgment is further rendered in favor of the defendants, Certain Underwriting Members of Lloyd's and Certain London Market Companies, finding that pursuant to the allocation method applied they do not owe any indemnity with regard to the Bayou Bonfouca or Pearl River sites. In connection with this judgment, the designation judgment allocating the losses at both sites to the policies in effect between April 11, 1969 and April 11, 1970, is hereby reversed.
Finally, we deny the plaintiffs'/appellees' motion to strike assignment of error as moot.
2002 CA 0369: MOTION TO STRIKE DENIED; JUDGMENT REVERSED AND RENDERED.
2002 CA 0371: JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
2002 CA 0372: JUDGMENT REVERSED.
NOTES
[1] Judge Ian W. Claiborne, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.
[2] In addition to Norfolk Southern Corporation, the plaintiffs in this action are Norfolk Southern Railway Company, Norfolk and Western Railway Company, The Alabama Great Southern Railroad Company, Southern Region Industrial Realty, Inc., Central of Georgia Railroad Company, and The Cincinnati, New Orleans, and Texas Pacific Railway Company. Except where reference to the specific entity is necessary for clarity, we will refer to the plaintiffs collectively as Norfolk.
[3] The London Insurers refer to themselves in their answer more specifically as "Certain Underwriting Members of Lloyd's, London subscribing to certain policies of insurance issued to certain plaintiffs and at issue in plaintiffs' Fourth Amending Petition for Declaratory Judgment and for Damages, each for himself only and no other, and those London Market Insurance Companies listed in Exhibit A [of the answer], each for itself only and no other." Norfolk named numerous other insurance companies as defendants in its various petitions; however, by the time the matter proceeded to trial, the London Insurers were the only defendants remaining in the lawsuit.
[4] Norfolk's fourth amending petition sought coverage for numerous environmental sites in Louisiana (3 sites), Tennessee (3 sites), Ohio (1 site), Georgia (4 sites), Virginia (7 sites), West Virginia (4 sites), Kentucky (1 site), South Carolina (2 sites), Florida (1 site), Illinois (2 sites), North Carolina (1 site) and Arkansas (1 site). The sites proceeded to trial either separately or in groups of sites located in the same state. These appeals deal only with the judgments concerning the Louisiana sites.
[5] All judgments were designated final and appealable.
[6] The Pearl River site was actually part of a larger tract that extended into Mississippi. The tract was originally purchased by the New Orleans and Northeastern Railroad (NO & NE) in 1882. NO & NE continued to own the property until 1969, when it was merged into plaintiff, The Alabama Great Southern Railroad Company.
[7] ARCO owned Chemlink, as well as one-half of the land on which the large impoundment was situated in 1987.
[8] Removal of the soils also involved removal of tree stumps, concrete, polymer sludges, and other items left over from operations of the chemical companies and cement company on the site.
[9] The site actually cost a total of $10,969,682.16 to remediate; however, ARCO contributed a substantial portion of those costs, and PRWPC paid Norfolk and ARCO $500,000 each in connection with the remediation.
[10] The EPA also alleged in the petition that the railroad had disposed of hazardous materials, or arranged for their disposal at the site. That theory appears to have been abandoned, and the evidence in the record indicates that the creosote brought into the site was delivered by barge.
[11] The date of this fire is unclear. The EPA alleged in its petition that the fire occurred in 1972; however, the EPA reports discussing the fire set the date in 1970. At trial, Norfolk's witnesses asserted that the fire had occurred in 1972, despite the conflicting reports. On appeal, however, Norfolk contends that the fire actually occurred in 1970. The jury made no specific finding as to the date of the fire.
[12] The London Insurers tried to have Norfolk's claims regarding the Bayou Bonfouca site severed from the trial of the Pearl River and Southern Shipbuilding sites until the underlying CERCLA action was resolved. The trial court denied this request, however.
[13] The settlement was divided between the EPA, which received $11,700,000, and the LDEQ, which received $1,300,000.
[14] With minor changes, this coverage grant remained constant throughout the policies.
[15] Certain of these policies defined an "occurrence" as "an accident and/or happening or series of accidents and/or happenings arising out of one event." Other policies defined the term to mean "an accident and/or happening or series of accidents and/or happenings arising out of one event neither expected nor intended from the standpoint of the Assured."
[16] Some of the policies placed these restrictions within the definition of "property damage," whereas others placed the restrictions in the exclusions section of the policy.
[17] One policy extended from November 12, 1969 to November 12, 1972, and provided $5,000,000 in coverage above an underlying limit of $11,000,000. In addition, certain policies extended from July 26, 1973 to July 26, 1976 and June 26, 1973 to June 26, 1976. The lowest underlying limit under those policies was $16,000,000.
[18] The minimum SIR per occurrence was $1,000,000 from April 11, 1969 to May 25, 1975; $1,500,000 from May 25, 1975 to July 11, 1982; $2,000,000 from July 11, 1982 to July 11, 1985; and $3,000,000 from December 31, 1985 to May 31, 1986. (P-673).
[19] Norfolk's suit was for declaratory judgment and indemnity only. It was undisputed that the policies did not contain a duty to defend. (R. Vol.26, p. 5981).
[20] Although the issue was not explicitly reserved in the coverage judgment, the trial court also retained jurisdiction over the issue of the application of the pollution exclusions contained in certain of the policies beginning in 1976 at a hearing on a motion in limine prior to the jury trial.
[21] This judgment was designated final and appealable on March 28, 2002.
[22] 2001 CW 0567 and 2001 CW 0778.
[23] On March 28, 2002, the trial court designated this judgment final and appealable.
[24] This ruling only applied to the trials concerning the three sites located in Louisiana. The London Insurers later attempted to have Virginia law applied to the remaining sites located in various states outside Louisiana. The trial court ultimately ruled that the substantive law of the state in which each environmental site was physically located would apply. That ruling is not presently before us.
[25] 1998 CW 2015.
[26] The policies between 1969 and 1982 were issued in favor of Southern Railway Company and its associated, affiliated, or controlled companies. The policies between 1982 and 1986 were issued in favor of Norfolk Southern Corporation, a Virginia corporation, which owns Norfolk and Western Railway Company and the Southern Railway Company, and their controlled and affiliated and/or subsidiary or associated companies. Norfolk and Portsmouth Belt Line Railroad Company was also named as an additional assured on some of these policies after 1982; however, this company is not a plaintiff in this matter.
[27] Beginning in 1974, the policies also named Norfolk Southern Railway Company, which was incorporated under Virginia law in 1894, as an additional assured. Norfolk Southern Railway Company was later renamed Carolina and Northwestern Railway Company, and it merged into Southern Railway Company under that name in 1988. Southern Railway Company was subsequently renamed Norfolk Southern Railway Company in 1990.
[28] In reaching its conclusion that Louisiana law should apply to this matter, the trial court relied, in part, on a belief that at least one of the defendants had its principal place of business in Louisiana and that one of the contracts was formed in Louisiana. Although an original defendant, Audubon Indemnity Company, did have its principal place of business in Louisiana, it had settled with the plaintiffs on July 10, 1998, prior to the trial court's ruling on this issue. Audubon was released from the litigation by a judgment signed January 14, 1999. Moreover, even if Audubon had remained in the litigation, the formation of one of numerous relevant insurance contracts in Louisiana does not rival the multiple contacts Virginia has with the parties and the transactions.
[29] Specifically, the court considered the following factors: (1) the entire population of Livingston parish was effectively included in the class definition, with over 14% of the population having filed proofs of claim; (2) members of the plaintiffs' class had died or were subject to increasing medical problems with a bleak prognosis related to the contamination at the site; (3) Louisiana's public medical facilities must provide care for injuries arising out of the contamination at the site; and (4) the business reputation of Livingston parish had suffered as a result of its being the location of a CERCLA Superfund site. In re Combustion, Inc., 960 F.Supp. at 1068.
[30] La. R.S. 30:2002.
[31] The trial court did not address this issue.
[32] With minor variations, this language is contained in all relevant policies.
[33] We believe that our determination is also in line with the decisions of courts in other jurisdictions that have addressed the issue. See Chesapeake Utils. Corp. v. American Home Assurance Co., 704 F.Supp. 551 (D.Del.1989); Singer v. Lexington Ins. Co., 658 F.Supp. 341 (N.D.Tex.1986); W.R. Grace & Co. v. Hartford Accident and Indemnity Co., 407 Mass. 572, 555 N.E.2d 214 (1990).
[34] We apply Virginia law only to the issue of late notice because the parties have failed to demonstrate an actual conflict between Louisiana and Virginia law with regard to any other issue. See Favaroth v. Appleyard, XXXX-XXXX, p. 4, (La.App. 4 Cir. 5/2/01), 785 So.2d 262, 265, writ denied, 01-1945 (La.11/9/01), 801 So.2d 375.
[35] A written judgment silent as to an issue is construed as a rejection of the relief requested on that issue. Danzey v. Evergreen Presbyterian Ministries, 95-167, p. 3 (La.App. 3d Cir.6/7/95), 657 So.2d 491, 494.
[36] All of the policies required immediate notice of the occurrence or claim, but qualified that requirement by establishing a monetary threshold triggering the requirement for notice. The lowest threshold was found in certain policies requiring that the notice be immediately provided regarding all incidents that the assured's claims-legal department valued at $250,000 or more.
[37] The record indicates that a small number of residents may have complained of unpleasant odors emanating from the creosote facility.
[38] The policies actually continued until May 31, 1986.
[39] In an action on an insurance policy, the insured has the burden of proving facts that bring his claim within the coverage of the policy. Central Louisiana Elec. Co. Inc., 579 So.2d 981, 986, n. 11 (La.1991); Gandy v. United Services Auto. Ass'n, 97-1095, p. 6 (La.App. 5th Cir.10/14/98), 721 So.2d 34, 36, writ denied, 98-2836 (La.1/15/99), 736 So.2d 208.
[40] Norfolk argues that the London Insurers have waived the right to challenge the verdict form on appeal because they did not properly object to the form in the trial court. A review of the record, however, demonstrates that the London Insurers properly preserved their right to challenge the verdict form.
[41] Norfolk contends that the issue of pre-policy damage and apportionment of the damage was never presented to the jury for determination because the parties had stipulated that the issue would be reserved to the trial court for its determination in a subsequent bench trial. Interestingly, Norfolk originally argued just the opposite to the trial court during the bench trial on allocation. When the London Insurers attempted to raise the issue again at the allocation trial, citing their pending motion for judgment notwithstanding the verdict and new trial, Norfolk objected and claimed that the jury had already considered and rejected the London Insurers' argument. In any event, a review of the record does not reveal any such stipulation, and the London Insurers' numerous objections to the omission of the issue from the jury verdict form demonstrate the incorrectness of Norfolk's contentions.
[42] The London Insurers had also challenged the validity of the jury verdict by asserting on appeal that the trial court had violated La. Code Civ. P. art. 1796 by communicating with the jurors after they had retired for deliberations without notifying the parties. Norfolk filed a motion with this court seeking to strike this assignment of error. Because we have decided that the jury's verdict was improper on other grounds, we need not address this issue. Therefore, Norfolk's motion to strike is denied as moot.
[43] Norfolk argues that the issue of pre-existing damage is moot because of the allocation method chosen by the trial court. This argument overlooks the fact that damage must be covered before it can be allocated to a policy period. We have not yet addressed the issue of the amount of pre-existing damage; however, to avoid repetition, we will discuss this issue in the section on allocation below.
[44] We apply Louisiana law to this issue because the London Insurers have failed to demonstrate an actual conflict between the laws of Louisiana and Virginia. Favaroth, 00-0359 at p. 4, 785 So.2d at 265. According to Morrow Corp. v. Harleysville Mutual Ins. Co., 110 F.Supp.2d 441, 448 (E.D.Va.2000), the Virginia Supreme Court has not determined which trigger, if any, it will apply in environmental damage cases.
[45] The trigger of coverage is the event or condition that determines whether or not a policy responds to a specific claim. Cole v. Celotex Corp., 599 So.2d 1058, 1075, n. 50 (La.1992). The fact that a policy has been triggered means that there may be liability coverage under that policy, subject to the policy's terms, the application of any exclusions in the policy, and any other defenses the insurer may raise. Public Service Co. of Colorado v. Wallis and Cos., 986 P.2d 924, 938, n. 11 (Colo.1999).
[46] See Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), reh'g granted, in part, clarified, 657 F.2d 814 (6th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982); South Carolina Ins. Co. v. Coody, 813 F.Supp. 1570, 1576 (M.D.Ga.1993).
[47] See Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 523 F.Supp. 110 (D.C.Mass.1981), modified, 682 F.2d 12 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983).
[48] See Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, reh'g denied, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982); South Carolina Ins. Co. v. Coody, 813 F.Supp. 1570, 1576 (M.D.Ga.1993).
[49] See American Home Prod. v. Liberty Mut. Ins. Co., 565 F.Supp. 1485 (S.D.N.Y.1983), modified, 748 F.2d 760 (2d Cir.1984).
[50] By contrast, Louisiana courts have often adopted the manifestation theory when addressing issues of coverage for property damage other than long-term environmental damage. See Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190 (La.1974); St. Paul Fire and Marine Ins. Co. v. Valentine, 95-0649 (La.App. 1st Cir.11/9/95), 665 So.2d 43, writ denied, 95-2961 (La.2/9/96), 667 So.2d 534.
[51] Norfolk no longer owned the Pearl River site property at the time the site was remediated; however, Norfolk did own the property during all periods in which contaminating activities occurred (1963 to 1974), as well as during all periods in which the insurance policies were triggered (1969 to 1974). The issue of the owned property exclusion was not raised in connection with the Bayou Bonfouca site.
[52] See also Compass Ins. Co. v. Cravens, Dargan & Co., 748 P.2d 724, 730 (Wyo.1988); U.S. v. Conservation Chem. Co., 653 F.Supp. 152, 200 (W.D.Mo.1986).
[53] Norfolk alleges that only $118,500.56 of the total of $5,335,688.49 expended by Norfolk at the site was connected to groundwater contamination.
[54] 42 U.S.C.A. § 9607
[55] Again, we apply Louisiana law to this issue because the London Insurers have failed to demonstrate an actual conflict between the laws of Virginia and Louisiana. Just as in the issue of which coverage trigger applies, Virginia law is unsettled on the issue of allocation. See Morrow Corp. v. Harleysville Mutual Ins. Co., 101 F.Supp.2d 422, 427, n. 5 (E.D.Va. 2000). In that case, a Virginia federal court speculated that Virginia would employ a pro rata allocation approach. In doing so, the court cited with the approval the Colorado case of Public Service Co. of Colorado v. Wallis and Cos., 986 P.2d 924 (Colo.1999) in which such an approach was employed. The Morrow court acknowledged, however, that it was not called on to decide that issue at the time. By contrast, Norfolk has cited two cases purportedly applying Virginia law (one from Virginia and one from Florida) that allegedly hold that Virginia would apply the "all sums" method; however, neither of these cases is published, and such cases are not to be cited or used as precedent in any other matter. Uniform Rules-Courts of Appeal Rule 2-16.3; L.M. v. J.P.M., 97-1215, p. 4 (La.App. 5th Cir.5/13/98), 714 So.2d 809, 811, n. 5, writ denied, 98-1615 (La.9/25/98), 725 So.2d 487.
[56] The coverage grant has been cited many times and provides in part that the London Insurers will indemnify Norfolk for "all sums" due to "property damage...arising out of occurrences happening during the policy period."
[57] We have already determined that the policies do not provide coverage for pre-existing damage.
[58] For purposes of this opinion, we accept the amounts alleged by Norfolk as the ultimate net loss it sustained for each site.
[59] The policies run for one-year intervals from April 11, 1969 to April 11, 1972. Additional policies run from April 11, 1972 to April 11, 1973, and April 11, 1972 to April 11, 1975. Each policy has an SIR of $1,000,000.
[60] Indeed, Norfolk's own allegations about the date of the fire have changed from the time of trial to the appeal.
[61] The monthly average is actually $42,013.295. All future calculations will be made using this extended figure.
[62] Although Ducre suggests that the total judgment should be divided by the number of years in order to determine a per year judgment amount, we have chosen to calculate a per month judgment because of the specificity of the information that we have. As the court noted in Society of the Roman Catholic Church, 26 F.3d at 1366-1367, such allocation methods are useful when more specific information is not available. In this case, however, we do have more specific information with which we may make a more precise allocation.
[63] We are aware that the large surface impoundment at this site resulted from the levee constructed in 1971 to prevent the contaminated wastewaters from leaving the site. An argument could be made that the costs for remediating that portion of the site should only be allocated to the policy periods from 1971. We reject this approach, however, because the evidence in the record is clear that the damage to the area that later became this impoundment, including the soil contamination and other environmental impacts, had begun in 1963, and continued throughout all periods that the facility was in operation.